IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

v.

OSMOSE UTILITIES SERVICES, INC.,

Defendant.

CIVIL ACTION FILE NO.:

1:24-cv-4140-MLB-JKL

**FINAL REPORT AND RECOMMENDATION**

This is an employment discrimination case in which Plaintiff Equal Employment Opportunity Commission (the "EEOC") asserts that Decreshia Lee Render ("Render"), on whose behalf it has sued, was unlawfully discriminated and retaliated against in violation of the Americans with Disabilities Act ("ADA"), when Defendant Osmose Utilities Services, Inc. ("Osmose") allegedly (1) failed to accommodate her stroke-related disability, (2) terminated Render's employment because of her disability, and (3) also retaliated against Render for engaging in protected activity when it discharged her. [Doc. 1.]

The case is before the Court on the Plaintiff's motion for partial summary judgment, which seeks summary judgment on the issue of whether Render is

disabled and as to Defendant's third, fourth, and twelfth affirmative defenses, and Defendant's motion for summary judgment, which seeks summary judgment on all of Plaintiff's claims. [Docs. 48, 61.[1]] For the reasons that follow, it is **RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART** [Doc. 4 and that Defendant's motion also be **GRANTED IN PART AND DENIED IN PART** [Doc. 61].

## I. SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that it is entitled to summary judgment. *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the

[1] The materials docketed at entry 62 are merely supporting materials for Defendant's motion for summary judgment, which is docketed at entry 61. [*See* Docs. 61, 62.] The Clerk is **DIRECTED** to terminate the "motion" designation from the papers docketed at entry 62.

absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The non-movant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the non-moving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is

to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## II. BACKGROUND

### A. Preliminary Factual Considerations

In preparing the factual recitation below, the Court has considered the Plaintiff's statement of material facts [Doc. 48-2 ("PSMF")]; Defendant's statement of material facts [Doc. 61-1 ("DSMF")]; and Plaintiff's statement of additional material facts [Doc. 70-8 ("PSAF")], as well as the responses and reply thereto [*see* Doc. 65 ("R-PSMF"), Doc. 69-3 ("Reply-R-PSMF"), Doc. 70-5 ("R-DSMF"), Doc. 71-1 (R-PSMF)]. Where possible, the Court has relied on those statements of facts and responses.

When resolving each of the parties' legal arguments, the disputed facts are presented in the light most favorable to the nonmoving party. *See Lofton v. Sec'y of Dep't of Child. & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). Where there is a conflict in the evidence, the Court accepts the nonmoving party's evidence as true. *See Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) ("If there is conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor."). Where the party responding

to a statement has neither refuted nor stated valid objections to the material facts as set forth in the statement, those facts are deemed admitted by operation of law. *See* LR 56.1B(2), NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1267-69 (11th Cir. 2008). In those instances where a party denies a statement of fact (in whole or in part), the Court has reviewed the record to determine whether it is disputed and, if so, whether any dispute is material.

The Court does not rule on each and every objection or dispute presented by the parties in this report and recommendation, and discusses objections and disputes only when necessary—that is, in relation to a genuine dispute of a material fact. The Court has also conducted its own review of the materials submitted in support, including the depositions and declarations filed in this case, along with the exhibits thereto, and includes some facts drawn from its own independent review of the record. *See* Fed. R. Civ. P. 56(c)(3).

The Court now turns to the facts of the case.

## B. Factual Background

### 1. Render's Employment with Defendant

Defendant is an infrastructure support services company that assists with the inspection, restoration, and repair of utility poles throughout the United States and Canada. (DSMF ¶ 1.) Render started with Defendant as a temporary

employee, and on March 12, 2018, Defendant hired her as a full-time Locator working out of its Peachtree City, Georgia office. (DSMF ¶ 2; R-DSMF ¶ 2; PSMF ¶ 2; R-PSMF ¶ 2.)

Defendant's job description for the position states that Locators support field operations, prepare and submit requests for locating and marking underground utilities near poles to state One Call centers (also referred to as state 811 centers), and routinely interact and coordinate with field operations personnel (foremen, supervisors, managers), project managers, utility companies, locating contractors, and government agencies. (*See* One Call Locator job description [Doc. 48-6].) Essentially, Locators contact the state 811 centers—either via telephone or via an online portal on a state's 811 center website—to have water, gas, and electricity lines marked before field operations personnel work on a given utility pole or set of poles, to ensure the safety of personnel and avoid utility disruptions caused by cut lines. (*See* Dep. of Brian Scotch [Doc. 50-1] at 18; Dep. of Rebecca Swaney [Doc. 50-2] at 44-46). Render's primary job responsibilities were to coordinate locate requests with field personnel, submit location requests to state One Call centers, monitor the status of location requests

and tickets,[2] respond to requests and questions, and maintain documents related to her work. (PSMF ¶ 3.) The requirements for reporting work to utilities vary from state to state based on state-specific requirements (DSMF ¶ 5; R-DSMF ¶ 5), but Locators are required to be able to perform such work in multiple states (DSMF ¶ 6).

In 2018, sometime after Render's hiring, Rebecca Swaney became Lead Locator. (Swaney Dep. at 11, 15, 47; *see also* PSMF ¶ 8; R-PSMF ¶ 8.) As Lead Locator, Swaney received requests for locating and marking utility poles, assigned those requests to Locators, monitored the performance of the Locators, reviewed tickets for accuracy and completion, and assisted with state-specific training. (Swaney Dep. at 12-13.) Swaney had no authority to discipline or terminate employees, but she did provide feedback and retraining to Locators, and discussed Locators' productivity and any ongoing performance issues with those Locators' supervisor. (*Id*. at 12-14, 20-21 ("On a day-to-day basis I did not report [detailed productivity results]. [W]hen I saw issues arise continuously I would go have a conversation with my boss at the time Brian Scotch."), 40-41

[2] Locators are assigned utility poles in packets called "tickets." (DSMF ¶ 4.) Once the data for a ticket is entered into Defendant's system, a Locator submits the completed ticket to the state's monitoring agency. (*Id.*)

(testifying that she discussed issues with Render's performance with Scotch verbally, in-person); *see also* Scotch Dep. at 16-17 ("Q: And when you discuss productivity, what type of actions would you generally take after Ms. Swaney reported, let's say some negative productivity. A: I would just instruct her to keep an eye on it and keep me updated on -- on any progress.").)[3]

In July of 2018, Manager of Operations Support Brian Scotch took over the supervision and management of the Locator team. (DSMF ¶ 9; PSMF ¶ 6.) Scotch, in turn, reported to Vice President of Operations Support Buck Braswell. (PSMF ¶ 7.)

### 2. Render's Work Performance in 2018

Scotch tracked Locator productivity using a productivity spreadsheet (the "Productivity Tracker"), which showed the number of poles Locators completed and the speed at which they did so. (DSMF ¶ 10;[4] *see also* Decl. of Brian Scotch

---

[3] Render believed that she reported directly to Swaney. (PSMF ¶ 10; R-DSMF ¶ 10.)

[4] Plaintiff objects to this statement of fact, asserting that it "does not admit that the information contained in the tracker [wa]s accurate" or that it accurately reflected "Render's 'productivity.'" (R-DSMF ¶ 10.) It does not, however, cite to any evidence in support of its position. Federal Rule of Civil Procedure 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). Moreover, pursuant to Rule 56(e), "[i]f a party fails to properly support an assertion of fact or fails to properly address

[Doc. 61-2] ¶¶ 8-11; Productivity Tracker [located at Docs. 61-4[5] (original); Doc. 69-2 (with highlights by Plaintiff)].) According to Scotch, the underlying data for

---

another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Further, this Court's Local Rule 56.1B(2)(a)(2) provides:

> This Court will deem each of the movant's facts as admitted unless the Respondent . . . directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number) . . . .

LR 56.1B(2)(a)(2), NDGa. As a result, in instances such as this, where a party provides no citation to evidence to support its response to a statement of fact, the Court deems such facts admitted for the purposes of summary judgment, at least where the proposed facts are material and supported by a citation to admissible evidence in the record. *See* LR 56.1B(2)(a)(2), NDGa.; *see also Reese*, 527 F.3d at 1268.

Plaintiff's further complaint that Defendant "did not produce the e-mails underlying the 'productivity tracker' in discovery," does not change this result. During discovery, Plaintiff made no attempt to seek a conference with the undersigned pursuant the Court's scheduling order to discuss any discovery disputes and did not file any motion to compel. [*See* Doc. 8 at 3-4 (scheduling order, outlining procedure for raising discovery disputes and stating) ("All motions related to discovery, including, but not limited to, motions to compel discovery and motions for protective order, shall be filed within thirty (30) days of the occurrence of grounds for the motion. Failure to file a discovery motion within thirty (30) days, absent a showing of reasonable cause for a later filing, may constitute a waiver of the relief sought.").] Plaintiff also has not asked for relief from summary judgment under Federal Rule of 56(d). "Thus Plaintiff has made no showing that would justify relief based on any deficiencies in Defendant's discovery responses." *Sweet v. Lockheed Martin Corp.*, No. 1:08-CV-2094-WBH-SSC, 2010 WL 11493761, at *8 (N.D. Ga. Jan. 28, 2010) (collecting authority), *report and recommendation adopted in relevant part*, 2010 WL 11493760 (N.D. Ga. Mar. 31, 2010).

[5] The spreadsheet was manually filed by Defendant. [*See* Doc. 63.]

the Productivity Tracker was provided by the Locators, who submitted completed assignment reports daily or at the end of each week. (DSMF ¶ 11.[6])

Of the 42 weeks that Render worked as a full-time Locator in 2018, her poles-per-hour, as reflected in the Productivity Tracker, ranked in the bottom half of Locators for 35 of those weeks, and ranked in the bottom quarter for 19 of those weeks. (DSMF ¶ 12.[7]) [*See also* Docs. 61-4; Doc. 69-2.] Of course, that means that

---

[6] As with the prior statement of fact, Plaintiff objects to this statement because it "does not admit" to the accuracy of Productivity Tracker, as it does not have those underlying emails. (R-DSMF ¶ 11.) For the reasons explained in the foregoing footnote, however, this objection is without merit here.

[7] As with the prior statements of fact, Plaintiff objects to this statement because it "does not admit" to the accuracy of Productivity Tracker, as it does not have the underlying emails from which it was constructed. (R-DSMF ¶ 12.) For the reasons explained in the foregoing footnotes, however, this objection is without merit.

Furthermore, as it relates to Scotch's reliance on the productivity figures in the Tracker in making the employment decisions at the heart of this case, Plaintiff has also offered no evidence to dispute Scotch's *belief* that the numbers provided by the Locators and compiled into the Productive Tracker were incorrect. As in most employment cases, the inquiry:

> centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head. The question is not whether [Render's productivity was precisely matched on the Tracker.] . . . The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so.

*Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

she was also in the top half of performers for seven weeks in 2018. [*See* Docs. 61-4, 69-2.]

In February 2019, Scotch initiated performance reviews for the Locator team based on their performance in 2018. (DSMF ¶ 13.) Scotch testified that, because he was "so new to the group," he "didn't know these individuals well enough to rate their performance," and "[s]o everybody got performance meets standard." (Scotch Dep. at 26-27; *see also id.*, Ex. 3 (Render performance review, stating that there were no goals set for the Locator team in 2018).) Still, Scotch also affirmatively testified to relying upon Render's daily production counts when he completed her performance review, and wrote:

> DeCreshia started with Osmose in 2018 and has worked on getting registered for multiple states. DeCreshia performs her job efficiently. She needs to work on her communication skills. DeCreshia often forgets to email all the parties her completed work at the end of the day.

(Scotch Dep. at 24, Ex. 3.) Despite not mentioning it in her performance review or, apparently, during his deposition,[8] Scotch testified in his declaration that Render also had problems submitting tickets, often received voided tickets notices, and failed to properly complete tickets; he further testified—

---

[8] The terms "void" and "voided" do not appear in Scotch's deposition. (*See* Scotch Dep. at 65-66 (index).)

corroborating his statement in her review—that she failed in a lot of her "end-of-day duties." (Scotch Decl. ¶ 15, Ex. A (Oct. 2018 voided tickets).) Even so, Scotch never disciplined Render about her performance with any formal write-up, as he did not feel that her performance warranted it. (PSMF ¶ 13; R-PSMF ¶ 13[9]; *see also* Scotch Dep. at 23, 41; Render Dep. at 164.)

Over the first six months of 2019, Render's poles-per-hour ranked in the bottom half of Locators for 21 of 27 weeks, and for eight weeks, she ranked very last among Locators. (*See* Scotch Decl. ¶ 13) [*See also* Docs. 61-4, 69-2.] As before, this means that she was in the top half of performers for six weeks during the

---

[9] Defendant objects to consideration of this fact because it contends that "Scotch understood the question to be asking whether he had ever issued Render discipline at the time of her 2018 performance review." (R-DSMF ¶ 13 (citing Scotch Dep. at 22:8-23:12).) A brief review the deposition transcript, however, demonstrates that Scotch was testifying generally about Render's performance, without any reference to a specific time period. (*See* Scotch Dep. at 22:8-10 ("Q: Now I'm going to ask you some questions about Ms. Render's performance. What was your business relationship like with Ms. Render?"), 22:16-17 ("Q: How would you describe Ms. Render's performance?"), 23:1-2 ("Q: Did you *ever* speak to Ms. Render about her performance?") (emphasis added), 23:6-10 ("Q: Did you *ever* discipline Ms. Render regarding her performance? A: No. Q: Why not? A: I didn't feel that it warranted it at the time.") (emphasis added).) It was not until *after* this full exchange was completed that Render's 2018 performance review was introduced and discussed. (*See* Scotch Dep. at 23:13-20 ("Q: Can you pull up Exhibit No. 3? (Plaintiff's Exhibit No. 3 marked for identification.) . . . Q: Do you recognize Exhibit No. 3? A: I do. Q: What is Exhibit No. 3? A: It's her 2018 performance review.").)

first half of 2019. (*See* Scotch Decl. ¶ 13) [*See also* Docs. 61-4, 69-2.] And while Render's poles-per-hour rate ranked 14th among Locators who worked at least eight weeks during that period of time, there were still at least four Locators ranked below her on that metric. (*See* Scotch Decl. ¶ 13) [*See also* Docs. 61-4, 69-2.]

**3. Render's Car Accident**

On July 1, 2019, while Render was stopped at a red light, her car was struck by another vehicle. (*See* Render Dep. at 15-16, 63-64, Ex. 1 at 2-3; *see also* Decl. of Charles W. Hoffman, [Doc. 61-3], Ex. 3 (chiropractor records) at 27.) Her car was totaled, and she sustained minor soft tissue injuries to her neck and back. (DSMF ¶ 19.) Render did not receive any immediate care. (Render Dep. at 63-64.) However, sometime during the week following July 1, Render contacted a personal injury lawyer she found using Google, and at his direction, she visited a chiropractor on July 9. (DSMF ¶¶ 21, 22; R-DSMF ¶ 21; *see also* Render Dep. at 66-69.) The chiropractor recommended ongoing physical therapy appointments to treat Render's neck and back injuries from the automobile accident. (DSMF ¶ 22.)

Render testified that she reported the accident to Swaney the following day, July 2, and told Swaney that she would miss at least a couple days of work

as a result. (Render Dep. at 83-84.) Render did not, however, inform anyone with Defendant's Human Resources ("HR") department. (*Id.* at 82.) Regardless, it appears undisputed that Render provided her physical therapy appointment dates to Swaney, and that she (Render) was given permission to attend those appointments, apparently by Scotch. (DSMF ¶¶ 47, 48; PSAF ¶ 10; R-PSAF ¶ 10.)

**4. Render's Stroke and Subsequent Impairments**

On July 12, 2019, Render called an ambulance while at work because she had a bad headache, felt dizzy, could not see on her right side, and could not see one of her screens. (Render Dep. at 74-75.) [*See also* Doc. 48-13 (911 call recording).] Render reported to the 911 operator that her eyesight "went out," that the whole right side of her right eye was blurry, and that she could not see anything. (PSMF ¶¶ 18, 19.)

Swaney, meanwhile, testified that someone told her that 911 had been called for Render, that she found Render sitting in a chair in the front lobby, but that there was nothing apparent wrong with her, at least from physical standpoint. (Swaney Dep. at 30-31.) It is unclear if Swaney inquired into Render's symptoms. Still, when the EMTs arrived and decided to take her to the hospital, Swaney asked Render if she wanted Swaney "to go with her," which Render declined; instead, Render asked Swaney to call her boyfriend to let him

know, which she did. (*Id.*.) Swaney reported to Scotch that Render left Defendant's premises in an ambulance (PSMF ¶ 21), so both were aware of the general situation, even if not the particulars of Render's condition.

Render testified that she was taken to the hospital, where neurological testing revealed she likely had a stroke. (DSMF ¶ 26; R-DSMF ¶ 26; Render Dep. at 76, 78.) [*See also* Doc. 52-2 (emergency department records).] According to the medical records from her visit, Render reported having intermittent loss of vision in her right eye for approximately two weeks, which was originally associated with a sharp pain in her neck and head, and stated that since 2:00 pm that day (July 12), she had not been able to see laterally out of her right eye. [Doc. 52-2 at 14, 18, 21.[10]] (*See also* DSMF ¶ 28.) She underwent a stroke protocol and CT scan, but other than her vision problems and headache, there were no acute or focal intracranial findings on the scan; she showed no particular physical, memory, mood, attention, language, or affect problems; and her providers initially thought there was a "low probability of a [cerebrovascular accident]." [Doc. 52-2 at 15, 18, 31-34.] (*See also* DSMF ¶ 29; R-DSMF ¶ 29.) Render was discharged against medical advice later on July 12. (PSMF ¶ 23.)

[10] In citing to the medical records in this case, the undersigned uses the page numbers automatically affixed by the Court's CM/ECF system.

Render nevertheless returned to the emergency room the following morning, July 13, 2019, at approximately 8:00 am, again complaining about acute headaches and loss of vision in her right eye. (PSMF ¶¶ 24, 25; *see also* Doc. 52- at 73, 87.) An MRI soon after confirmed an acute left occipital stroke, consistent with an acute or subacute infarct.[11] [Doc. 52-2 at 100-01.] Hospital records also show that Render would need an evaluation of her "formal visual field and may need peli prism to expand visual field since she uses 3 monitors at work. [O]k to be off work until all that is obtained. f/u with Neurology this week upon discharge." (PSMF ¶ 27; *see also* Doc. 52-2 at 120.) Render was discharged from the hospital on July 15. (DSMF ¶ 27.)

Render has testified that, as a result of her stroke, she has (1) permanently lost peripheral vision in her right eye[12] and (2) has had memory problems continuing into the present. (Render Dep. at 94, 104-05, 120, 162, 166-67.) During

---

[11] An infarct is "an area of necrosis in a tissue or organ resulting from obstruction of the local circulation by a thrombus or embolus." Merriam-Webster Dictionary, located at https://www.merriam-webster.com/dictionary/infarct (last visited July 10, 2026).

[12] Plaintiff has clarified that, with regard to her vision, while "some days it can just be straight out black, like just straight black," sometimes it is more of a blurriness: "it is just a faded—nothing. I still can't see, but it ain't as black if that makes sense." (Render Dep. at 120.) So even though her vision impairment appears to fluctuate to some extent, her actual ability to see physical objects in her right peripheral vision has never returned.

an August 6, 2019 visit with her neurological provider (PSMF ¶ 28), she was observed to have vision loss, blurred vision, and flashing lights/spots in her vision, and an ophthalmology exam specifically found that she had a "right temporal hemifield defect . . . in right eye" and a "superior nasal deficiency" in her left eye. [Doc. 52-03 at 4-5; *see also* Doc. 52-02 (ophthalmology exam showing deficiency in right eye).] Her neurologist's assessment was that Render in fact suffered a cerebrovascular accident due to an embolism in the left posterior cerebral artery, which resulted in right homonymous hemianopsia.[13] (PSMF ¶ 30.) [*See also* Doc. 52-3 at 7-9.]

Jody Hamlett, Director of Human Resources for Defendant in 2018 and 2019, testified that a stroke causing peripheral vision loss, headaches, and blurred vision was "Yes. Very likely, yes" a disability under Defendant's ADA policy. (PSMF ¶ 35.)

---

[13] "Homonymous hemianopia is vision loss on the same side, left or right, in both eyes. It happens with conditions that affect your brain." Homonymous Hemianopia (Homonymous Hemianopsia), Cleveland Clinic, located at https://my.clevelandclinic.org/health/symptoms/homonymous-hemianopsia (last visited July 14, 2026).

### 5. Render Takes Leave

Around July 16, Render contacted Defendant to request leave under the Family Medical Leave Act ("FMLA")—beginning retroactively on July 13, 2019, and continuing through September 6, 2019—for treatment and recovery from her stroke. (DSMF ¶ 30; PSMF ¶ 31.) After her August 6, 2019 follow-up, Render's neurologist completed and submitted FMLA certification forms to Defendant the following day. (DSMF ¶¶ 31, 32; PSMF ¶ 32.) Although Render testified "[y]es" when asked whether her neurologist "cleared [her] to return to work without restrictions by September 9, 2019,"[14] (Render Dep. at 80), the FMLA certification form merely stated that she "may return to work on 9/6/2019" (*id.*, Ex. 13 [Doc. 61-10]). The completed form also noted that Render suffered from "peripheral vision loss in both eyes, headaches, [and] blurred vision"; that she needed "time for recovery" before returning to work; but that Render would not need to attend follow-up treatment appointments or to work on a reduced schedule because of the condition. (DSMF ¶ 33; R-DSMF ¶ 33; PSMF ¶ 32; *see also* Render Dep., Ex.

[14] Plaintiff did not offer up the "without restrictions" language on her own; it was, instead, part of counsel's question. (Render Dep. at 80.) And no one present at the deposition appears to have noticed that counsel identified September 9 as the neurologist's return to work date for Plaintiff, when the form actually indicated that the return date was September 6. (*See id.* at 80, Ex. 13 at 1.)

13.) Defendant's Human Resources department notified Scotch that Render requested leave under the FMLA, and Swaney also knew that Ms. Render would be out for a period of time. (PSMF ¶¶ 33, 34.)

Although her neurologist referred Render to an ophthalmologist so she could be evaluated for peripheral vision correcting eyeglasses, called "prism lenses" or "prism glasses," and although Render scheduled an appointment with the ophthalmologist, it is undisputed that she never attended the appointment or obtained prism lenses, despite maintaining that her peripheral revision remains permanently impaired. (DSMF ¶¶ 34-36.)

**6. Render Asks to Work Remotely**

Defendant's ADA policy states that it is an employee's "responsibility to notify their supervisor of the need for an accommodation," and that if an employee needs to request one due to disability, she should "please contact Human Resources at 770-[XXX]-[XXXX]." (PSMF ¶ 36; *see also* Hamlett Dep., Ex. 1 (ADA policy).) It goes on to read: "Upon requesting an accommodation, you may be asked for your input or type of accommodation you believe may be necessary or the functional limitations caused by your disability." (Hamlett Dep., Ex. 1.) It concludes by stating: "We will discuss the matter with you, investigate your request, and to the extent possible, attempt to reasonably accommodate

you." (*Id.*) Hamlett testified that under the policy, a request for input about the type of accommodation an employee needed (as well as any request for permission to obtain medical records) could come from HR, from the legal department, or from an employee's supervisor. (*Id.* at 46-49.) Practically speaking, she explained, "a manager can accommodate somebody who is otherwise disabled," and that "[t]here is no penalty to the manager for doing that," without input from HR; in other words "if an employee who is disabled under the law goes directly to a manager and a manager accommodates that situation and it never comes to our attention, that's not a terminable offense." (*Id.* at 51-52.)

Render testified that at some point prior to her return to work—probably a "couple of weeks" before, in September 2019—she realized that given her vision impairment, she "wasn't ready to drive,"[15] so she called Swaney to ask if she could work from home—that is, remotely. (DSMF ¶ 37; *see also* Render Dep. at 85-86.) Render admits, however, that she did not tell Swaney the basis for her request. (Render Dep. at 87-88.) Render testified that Swaney responded that

[15] Render testified about a near-accident at a four-way stop that was caused by her vision impairment, which was when she realized she was not ready to drive. (Render Dep. at 87.)

she "would get back with me and let me know," but that Swaney never followed up before her return date. (*Id.* at 88.)

Defendant tells a different story about the remote work request. Swaney denies ever being asked about working remotely, testifying that she only learned of the request through this litigation. (Swaney Dep. at 36.) Instead, Defendant and Scotch maintain that Render contacted Scotch about remote work in August 2019 and explained only that it would be "easier" for her. [Doc. 48-7 (Defendant's Resps. to Pl. Interrogs.) at Resp. No. 14.] (*See also* Scotch Dep. at 38, 49.) While Scotch says he did not inquire into "why" it would have been easier, he acknowledged that he knew the request related to her "personal health." (Scotch Dep. at 38-39, 49.) According to Scotch, he took the request to Buck Braswell, his boss, who denied the request as it was made—that is, simply because would be "easier"—because the Locator position was an in-person office position. (*Id.* at 39.) Scotch admits that he did not ask for clarification on the request from Render before speaking with Braswell, because he believed "it was about her personal health" and believed he could not inquire into "an employee's health status" due to "HIPAA laws," on which he was, admittedly, "not real versed." (*Id.* at 49.) Scotch testified that while he knew that she left in an ambulance before taking FMLA leave, he did not know why she went to the hospital, about her stroke, or

that her remote work request was related to an actual disability. (*Id.* at 37-39, 49-50.) Regardless, it is undisputed that Defendant denied Render's request to telework. (PSMF ¶ 42.)

According to Defendant, while the functions of the Locator position "could technically be performed remotely,"[16] it in fact allowed workers in 2019 to alternate working remotely,[17] but found that "employees' production decreased dramatically on the days when employees worked remotely."[18] [*See* Doc. 48-7 (Defendant's Resps. to Pl. Interrogs.) at Resp. No. 13.] (*See also* Swaney Dep. at 37-38 (noting that Defendant had a hybrid work situation due to a "space issue within the building" and that it was "short lived due to issues across the board," including decreased productivity and responsiveness).) As a result, Defendant's

---

[16] Render also testified that she could have performed her job from home. (Render Dep. at 62.)

[17] Along these lines, Render executed a Remote Work Agreement with Defendant in August 2018. (PSMF ¶ 5.)

[18] Scotch testified that whether the Locator position duties could be performed remotely "would depend on the person," and whether they had the "ability to maintain production requirements." (Scotch Dep. at 18; *see also id.* at 51 (acknowledging that there were no technical impediments); Swaney Dep. at 18-20 (acknowledging that many of the duties of the Locator position could be performed remotely); Dep. of Michael Cappas [Doc. 50-4] at 21 (same); Dep. of Buck Braswell [Doc. 50-3] at 21, 27 (noting that it was "technically" possible to work remotely as a Locator but that "it would have not been in the best interest of the company").)

management concluded that the Locator position would not be performed remotely, as the employees needed "the supervision associated with in-office work." [Doc. 48-7 at Resp. No. 13.]

Despite the foregoing, it is undisputed that from approximately March of 2020 to January of 2021—that is, the first ten months of the COVID-19 pandemic—Locators worked remotely (PSMF ¶ 54); that at least one Locator worked remotely for Defendant from California in 2018-2019 (PSMF ¶ 56); that an employee supervised by Swaney was hired in Florida in February 2020, despite Defendant having no Florida office [*see* Doc. 48-25] (*see also* Hamlett Dep. at 99); and that Defendant's employees are "currently allowed to work remotely if they need to" (Scotch Dep. at 21-22).

### 7. Render Returns to Work and Again Requests to Work Remotely

Render returned to work on September 9, 2019. (DSMF ¶ 40.) She testified that, upon her return, she again asked Swaney if she could work remotely, this time explaining that she was scared to drive due to the vision issues caused by her stroke.[19] (DSMF ¶ 41; *see also* Render Dep. at 88, 134-36.) Again, as just noted,

---

[19] Plaintiff specifically testified that she told Swaney "that the stroke had caused a little – it hit my memory, and it messed up my eye vision." (Render Dep. at 135; *see also id.* at 136 (testifying that she told Swaney "the stroke messed

Swaney denies being asked about remote work (Swaney Dep. at 36), and indeed, denies ever being told about Render's stroke before the litigation (*id.* at 30). She thought, instead, that Render contacted Scotch about working remotely. (*Id.* at 36.) Regardless, it appears undisputed that none of Render's requests to work remotely were approved.

Render explained that upon returning to work initially, she would have someone drop her off or her husband would follow behind her (and someone else would follow her home after work), because she was afraid of not being able to see out of the right side of her eye. (Render Dep. at 86-87.) Nevertheless, after a week or two, she felt like she was "disturbing others for how to get to work," and began to drive herself to work without aid. (*Id.* at 89.) Although Render, as just mentioned, testified that she mentioned her vision issues and stroke to Swaney in requesting to work remotely, she did not recall discussing "driving to work or getting rides" or "how [she was] getting to work" with Swaney. (*Id.* at 97-98; 135-36.) Render admitted that despite having the same peripheral vision issues presently, she now drives independently; however, she does not do so "often" and has to "be careful of [her] surroundings now." (*Id.* at 162, 165-66.)

---

with my vision, that I was scared to drive, and if it's a way to work from home, that was my reason of even asking.").)

She said it took about a year-and-a-half to be comfortable driving again. (*Id.* at 163.)

Scotch testified that before her return to work, Render also "asked if she could leave early on certain days to go to physical therapy appointments upon her return," which he approved.[20] (Scotch Dep. at 37-39, 45, 49; *see also* Swaney Dep. at 36-37 (explaining that Render provided a list of appointments with dates and times to Scotch, which he approved, and that Render then informed Swaney when she would be out).)

### 8. Render's Ongoing Work Performance and Other Requests Related to Her Vision and Memory Issues

Swaney testified that, throughout Render's employment, she (Swaney) was limited in what states she could assign Render work in, given Render's challenges "keep[ing] up" and actually completing her work. (Swaney Dep. at 47-48.) After Render's return from FMLA leave, however, Swaney testified that:

> [Render] was struggling to remember what steps needed to be taken each day. And it became time consuming on my end to continuously stop what I was doing to go assist her daily with the same things.

[20] Swaney also testified that Render provided a list of her physical therapy appointment dates, and that she (Render) was given leave to attend those appointments. (DSMF ¶ 47.) Render agreed that her requests to attend therapy were indeed approved. (DSMF ¶ 48; PSAF ¶ 10; R-PSAF ¶ 10.)

(*Id*. at 22.) Even so, Render testified generally that her stroke "just interfered [with her] memory," but that it did not interfere with her overall ability to do her job, and that she was able to her "job fine once she returned."[21] (Render Dep. at 97.)

Despite her testimony that she could perform her job "fine" after returning from leave, Render also testified that, because she was having memory issues due to her stroke, she asked Swaney for a list of her daily duties. (DSMF ¶ 56; *see also* Render Dep. at 42, 96-98.) Render's testimony is not entirely clear about whether she mentioned her stroke in making this request. (*Id.*) Regardless, the two "mutual[ly]" decided that Swaney would create a checklist of Render's daily tasks. (Swaney Dep. at 22.) As Swaney testified, "I put it in an e-mail and wrote it out so she could refer back to this if she needed to." (*Id.*) That email went out to Render, copying Scotch, on October 8, 2019. [*See* Doc. 48-22 (email with checklist).] It helped Render fix at least one error she was making in copying the correct individuals. (Render Dep. at 164.) [*See also* Doc. 48-23 (October 2019 emails showing correction).]

---

[21] She also admitted that teleworking would have no impact on her memory issues, either helping or exacerbating them. (*Id.* at 43.)

Render also asked Swaney to help adjust her computer monitors from three screens to two, as Render was having vision issues and trouble seeing her computer screens. (PSMF ¶ 47; R-DSMF ¶ 47.) Swaney did so, but denies that Render explained why she was having trouble seeing her monitors.[22] (Swaney Dep. at 31-34; *cf.* Render Dep. at 58-59, 98 (in testimony about monitors, Render fails to clarify whether she specified the reason for the requested adjustment).)

In addition to providing Render with the checklist and adjusting her monitors, Swaney testified that she only assigned Render work in California, which Swaney testified was one of the easiest states to work in. (Swaney Dep. at 22, 46-47.) That said, Render testified that there were only two challenging

[22] When asked if she was "involved in Ms. Render's disability accommodation requests," Swaney stated, "I helped her adjust her monitors. As far as other accommodation[s], I'm not aware of." (Swaney Dep. at 32.) When she was asked, as a follow up, "Did she ask you for an accommodation," Swaney testified further, "no, not that I remember." (*Id.*) Given this questioning and testimony, the Court rejects Plaintiff's characterization of this exchange as "Swaney consider[ing] Ms. Render's request for Swaney to adjust her computer monitors to be a request for an accommodation." (R-PSAF ¶ 9.) It is clear, in context, that Swaney was simply testifying about the requests Plaintiff's counsel had characterized as "accommodations." Indeed, Swaney reiterates immediately before and after this exchange, respectively, that she was not aware of Render's "physical impairments" at the time (Swaney Dep. at 31) and that she was not "aware that Render . . . had some type of accommodation going on" (*id.* at 33; *see also id.* (clarifying her belief that Plaintiff's FMLA leave was "[n]ot [an] accommodation," and that Swaney only "knew she was out on leave").

states—Virginia and West Virginia (Render Dep. at 51-52)—and so it is unclear the extent to which limiting her work to California eased Render's workload.

Regardless, over her final seven weeks of employment, Render ranked in the bottom half of Locators in poles per hour for all seven weeks, and in the bottom quarter for five of those seven weeks. (*See* Scotch Decl. ¶ 14.) [*See also* Doc. 61-4 (Productivity Tracker); Doc. 69-2 (Productivity Tracker with highlights from EEOC).] She also ranked last—twelfth out of twelve—in total poles completed over that period, though that metric does not appear to account for the approved time off for her therapy appointments or, apparently, any other time off. (Scotch Decl. ¶ 14) [*See also* Docs. 61-4, 69-2.] All the same, it appears that Render was still exceeding one or more of her peers' poles-per-hour rate over four of those seven weeks. (*See* Docs. 61-4, 69-2; *see also* R-DSMF ¶ 60.)

Beyond this, it is undisputed that after returning to work, Render continued to attend in-person physical therapy appointments with a chiropractor related to her injuries from the car accident.[23] (DSMF ¶ 63.) The records reflect

---

[23] In association with Render's chiropractic records, Defendant seeks to make much hay of the fact that they note her stroke and accompanying vision problems [*see, e.g.*, Doc. 61-3 at 32, 35] and observe improvement through at least October 22 [*id.* at 39 ("headaches, 50% better," and "[v]ision is improving"), 41 (same), 49 ("headaches, 75% better," and "[v]ision is fine now"), 55 ("[n]o headaches," and "[v]ision is fine"), 56 (same), 57 (same), 59 ("[n]o pain or functional limitations"). These observations, however, appear to be subjective

that she had chiropractor appointments on the following dates in 2019: September 12, 17, 18, 19, 24, 26; October 1, 2, 3, 22; and November 6, and 8. (DSMF ¶ 66.)

According to Scotch's declaration testimony, Render's payroll records, and the Productivity Tracker, it also appears that Render missed significant periods of work following her return. (*See* Scotch Decl. ¶¶ 16-18, Ex. 2 (payroll records).) [*See also* Docs. 61-4 (Productivity Tracker), 69-2 (Productivity Tracker with highlights).] According to the Productivity Tracker and her payroll records, between March 2018 and June 2018, Render mostly worked between 31 and 44 hours per week (with only seven weeks during that year-plus period below 31 hours per week). [*See* Doc. 61-4; Doc. 69-2 at 1-17.] After her return in September 2019, she mostly worked between 15 and 25 hours per week (with only one week during that two-month period over 30 hours). [Doc. 61-4; Doc. 69-2 at 19-20.] (*See also* Scotch Decl., Ex. 2 (payroll records).) Moreover, comparing the Productivity Tracker's records to her chiropractor appointments during the latter period, it

---

and not clinical evaluations. Indeed, Render's chiropractor has submitted testimony that while he observed a lack of perception in Plaintiff's eyes on July 25, 2019, the remainder of his notes merely refer to his "subjective evaluation[] that [her] vision was improving." (Decl. of Dr. Craig Steingraber [Doc. 69-1] ¶¶ 9-17.)

appears that Render missed some amount of work on days when she did not have a documented physical therapy appointment—that is, on September 9, 10, 11, 13, 16, 20, 23, 25, 27, and 30, and October 4, 8, 10, 11, 15, 18, 21, and 23. [*See* Doc. 61-4; Doc. 69-2 at 19-20.] (*See also* Hoffman Decl., Ex. 3 (chiropractor records.)[24] And of those days where she was absent despite not having a therapy appointment, Render completely missed work on nine occasions—that is, September 10, 11, 23, 27, and 30, and October 4, 15, 18, and 23. [*See* Doc. 61-4; Doc. 69-2 at 19-20.] (*See also* Hoffman Decl., Ex. 3 (chiropractor records).) Nevertheless, Scotch never formally reprimanded Render about her attendance. (*See* Scotch Dep. at 23, 40 (noting he never disciplined or wrote-up Render); *cf.*

[24] Plaintiff objects to consideration of DSMF ¶¶ 70 through 72 by arguing that (1) the payroll records do not provide support for these facts; (2) it denies that Render took unapproved leave; and (3) Defendant approved Plaintiff's leave requests. (See R-DSMF ¶¶ 70, 71, 72.) As to the first, the Court agrees, and relies on the payroll records only for a sense of how many hours Plaintiff worked, as set forth in the preceding two sentences. As to the second, Plaintiff provides no citation to evidence supporting that Render never took unapproved leave (for instance, by showing she had therapy or other approved appointments when she was apparently absent, or to dispute the Productivity Tracker's data), and thus, provides nothing to dispute Defendant's stated fact. And finally, as to the third—Plaintiff's observation that Defendant approved Render's leave for therapy appointments—as far as the undersigned can tell, these absences related solely to occasions when there was no documented therapy, and so Defendant's apparently blanket approval for leave for physical therapy would not apply.

Render Dep. at 164 (denying that Scotch ever counseled her about her performance at work).)

### 9. Defendant Terminates Render's Employment

Although Render was never formally reprimanded for her performance or attendance—indeed, Render testified that she was never even counseled about her performance by either Scotch or Swaney (Render Dep. at 164)—after she again missed work on October 23, 2019 without any medical appointment, Render's employment was terminated the following day, October 24, 2019.[25] (DSMF ¶ 73; R-DSMF ¶ 73.) [*See also* Doc. 61-4; Doc. 69-2 at 19-20.] Scotch made the decision to terminate Render and delivered the termination verbally to her that day. (PSMF ¶ 48; Scotch Dep. at 40.)

---

[25] Scotch and Hamlett both testified that they were unsure if there was a progressive discipline policy in place at the time, and Defendant's handbook seems to indicate that there was not. (*See* Scotch Dep. at 27-28; Hamlett Dep. at 88-90; Swaney Dep., Ex. 5 (Handbook) at 25 ("Disciplinary action may include an oral warning, written warning, suspension and/or discharge. The appropriate disciplinary action imposed will be determined by the company. The company does not guarantee that one form of action will necessarily precede another.").) That said, Scotch testified at his deposition that it is his practice to implement progressive discipline (Scotch Dep. at 28), and Hamlett said that, at the time, supervisors could skip over written discipline only due to "gross misconduct" or other "egregious circumstances" (Hamlett Dep. at 88-89.) Even so, the attendance policy states that "Excessive tardiness and absenteeism will be subject to verbal/written warnings and may lead to disciplinary actions including termination of employment." [Doc. 70-1.]

Scotch explained that, sometime around this period, he had begun discussions with management about transitioning a "large portion of the Locator work to a third-party contractor"; that in January 2019, Defendant had entered into a service agreement in furtherance of that plan; and that "[e]verybody was on the block to eventually be let go for the most part." (*Id.*; *see also* Scotch Decl. ¶ 7.) In this context, it appears that "everybody" refers to the Locator team, and according to Scotch, Render was the "first to go because of her performance." (PSMF ¶ 51.) Although Scotch never felt that her performance "warranted a[n] official write-up" and never mentioned her performance during Render's separation meeting, he testified that he had nevertheless spoken with Render about her performance, including verbal conversations with her about it (Scotch Dep. at 22-23, 40-41), and Swaney likewise testified that she had to "continuously stop what she was doing to go assist [Render] daily . . ." (Swaney Dep. at 22). Of course, Render denies having been counseled by the two. (Render Dep. at 164.) Regardless, Scotch testified that the decision was motivated by her "consistently low productivity, and poor attendance," given his "review of Render's performance metrics." (Scotch Decl. ¶ 21; *see also* Scotch Dep. at 41-42 ("[W]ere you basing her performance off her total time at Osmose? . . . [I]t would have been, you know, over the course of time, yes. . . . I believe it was an ongoing

thing where her production counts were lower than average.") In her separation notice, Scotch wrote, "DeCreshia is not performing her job as needed. We have to remind her of end of day/week to complete tasks that must be performed." (DSMF ¶ 75.) [*See also* Doc. 48-24 (separation notice).] Render was the only Locator fired in October 2019. (PSAF ¶ 17.)

Even though Scotch justified Render's discharge on the basis of outsourcing the Locator work, it appears that after Render was fired, Defendant actually hired two more Locators to work under Scotch in 2019,[26] four more Locators to work under Swaney in 2020, and four additional Locators in 2021 and 2022. [*See* Doc. 48-25 (list of employee hires).] (*See also* Swaney Dep. at 41-42 (acknowledging the hiring of Locators after Render's discharge).) Further, the only evidence the parties direct the Court to concerning the firing of other Locators suggests that they were not discharged until July 2020 at the earliest.

---

[26] Defendant quibbles that one of these employees, apparently Andrea Gafford, was in fact a contractor who previously performed Locator work. (R-DSMF ¶ 52 (citing Productivity Tracker, which shows only that *someone with the same initials* was performing Locator work starting in June 2018).) Even assuming that these are in fact the same person and that Gafford was in fact a contractor prior to Plaintiff's discharge, which Defendant has not established with its very limited evidence, there is still no dispute that this person was hired in a full-time capacity within seven days of Render's discharge. [*See* Doc. 48-25 (showing an October 30, 2019 hire date for Andrea Gafford).]

[*See* Doc. 52-4 (email exchange about "reorganization" and separating five Locators); *see also* DSMF ¶ 77; R-DSMF ¶ 77.] According to Scotch, this postponement was the result of "an influx of work," that "delayed the termination of other low performers," until July 9, 2020. (Scotch Decl. ¶ 22.) Notably, like Render, all of the Locators separated in July 2020 received "Performance Meets Standards" rating on their performance reviews delivered February 11, 2020. (DSMF ¶ 79.) Furthermore, in an email discussing their separation, Hamlett told Scotch, "For the Separation Form, please indicate and `Unsatisfactory Performance' and put `department reorganization' in the comments. (I want to refrain from using lack of work or position elimination . . . because of the hiring of Tamara at the same time we're terminating others.)." (PSMF ¶ 53.)

Scotch testified that after this period, Defendant ultimately kept a smaller number of full-time, high-producing Locators[27] on staff who were capable of handling more complicated workloads. (Scotch Dep. at 35-36.)

---

[27] In response to Plaintiff's statement of additional fact 18, Defendant points to Scotch's Productivity Tracker and a list of hired Locators to assert that the number of Locators dropped from 18 to 14 to 8 over the course of 2019 and 2020. (R-PSAF ¶ 18.) Defendant has not pointed to anything in the record, however, explaining or providing a foundation for these two documents that suggests that they are an exhaustive account of the number of Locators working for Defendant, and does not otherwise show how the number of Locators at any

### 10. Render's Ongoing Medical Treatment

On November 18, 2019, Render had a follow-up visit with her neurological provider (PSMF ¶ 58), and the records from that visit include the following summary:

> Decreshia Lee is a 28 y.o. right handed female who is here for Follow-up. . . . Since last visit, no stroke and vision is stable. She had a recent infection but no migraines. Elavil has helped her mood. She has not seen Heme/Onc since got fired from her job, due to missed day from doctor's appts despite being on FMLA.

(DSMF ¶ 83.) The records also show that Render still had a defect in her right temporal hemifield from the stroke with residual right homonymous hemianopsia. [Doc. 52-3 at 24-28.]

Additional records from a Piedmont Newnan Hospital emergency visit in January 2020 include the following notes:

> 28 y.o. female, presents to the ED via POV, c/o left sided weakness which she noticed when she woke up[.] Pt states that "I didn't feel right" this morning and she's had intermittent blurred vision since her last stroke. Pt adds that she was dizzy when she woke up at 0730 and had passed out, fallen on her stairs, and hit her tooth after driving her son to school.

---

given time can be derived from these documents, one of which only lists employees by initial and the other of which appears to be a document kept solely by Scotch. Without some additional foundation or testimony, the Court cannot agree that Defendant has established anything with regard to the total number of Locators across 2019 and 2020.

(Hoffman Decl., Ex. 5.) Render was placed on stroke alert at the time. (*Id.*) In the end, a head CT scan was negative for acute findings, but not surprisingly, still showed "chronic left occipital lobe infarct." [Doc. 70-6 (medical records).] Render denied having a second stroke after leaving employment with Defendant. (DSMF ¶ 85.)

During a neurological visit in May 2020, her provider noted the following:

> Since last visit, she reports no migraines or strokes. She is currently 22 weeks pregnant and is on Lovenox daily and ASA 81mg. She is followed at Grady due to high risk pregnancy. She did have the Peli Prism to expand her visual field but is not keen on it.[28] Her peripheral vision fluctuates and [sic] some days.

(DSMF ¶ 86.)

### 11. Additional Background

On January 30, 2020, Render filed a Charge of Discrimination with the EEOC (the "Charge"), alleging disability discrimination and retaliation. (DSMF ¶ 89.) Render testified that she drafted the statement for the Charge with no assistance. (DSMF ¶ 89.) More than a year later, on October 1, 2021, Defendant submitted its responsive position statement to Render's Charge. (DSMF ¶ 93; PSAF ¶ 22.)

---

[28] This obviously conflicts with Render's admission that she never wore prism glasses.

In April 2021, while her Charge was pending, Render filed a personal injury lawsuit based on her July 2019 automobile accident. (DSMF ¶ 90.) Included in the damages enumerated in Render's personal injury complaint were: (1) her visits to the hospital on July 12, 13, and 14, 2019, (2) a charge from "Coweta Emergency Group LLC" from July 12 (the date Render left work with stroke symptoms), and (3) Render's visits to the chiropractor from July 9, 2019 through November 7, 2019—along with other medical imaging expenses, all together totaling $60,939.55 in estimated damages. (DSMF ¶ 91.) On or around November 10, 2021, Render's personal injury lawsuit settled for $90,000, with Render receiving $54,066.43. (DSMF ¶ 92.)

Nearly two years later, the EEOC issued a determination letter on November 28, 2023, closing its investigation into Render's Charge and beginning conciliation efforts.[29] (DSMF ¶ 94.)

---

[29] Defendant seeks to introduce evidence about conciliation discussions before the EEOC. (*See* DSMF ¶¶ 95, 96). Plaintiff's objections are meritorious, however, as Title VII states that "[n]othing said or done during and as a part of such [conciliation] endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned." *See* 42 U.S.C.A. § 2000e-5; *see also Gray v. Deloitte LLP*, No. 1:17-CV-4731-CAP-AJB, 2019 WL 12520125, at *9 (N.D. Ga. Jan. 20, 2019) (holding that "statements of the parties and proposals exchanged by them in the course of trying to settle the dispute [before the EEOC] are protected by the blanket of confidentiality," even if purely factual information about the merits of the case that might be discussed are not similarly protected),

It is undisputed that during the investigation, Render did not disclose to the EEOC investigator that she had been the victim in an automobile accident or that she filed a personal injury lawsuit which was resolved via settlement. (DSMF ¶ 97.) As Render put it, she did not "think it had anything to do with the claim [] against [Defendant]." (Render Dep. at 134.) The EEOC, meanwhile, attributed this failure to disclose the personal injury lawsuit to her memory issues. (DSMF ¶ 103.)

By March 14, 2024, conciliation between the EEOC and Defendant failed. (DSMF ¶ 98.)

Other facts necessary to the resolution of the present motion are included in the discussion below.

---

*report and recommendation adopted*, 2019 WL 12520100 (N.D. Ga. Feb. 13, 2019), *aff'd*, 849 F. App'x 843 (11th Cir. 2021); *cf. Haykel v. G.F.L. Furniture Leasing Co.*, 76 F.R.D. 386, 392 (N.D. Ga. 1976) ("Defendant's requests for all information concerning [EEOC] conciliation negotiations in effect inquires into the substance of those negotiations, thereby raising the possibility of producing chilling effects in subsequent conciliation efforts."). Because the statements Defendant seeks to introduce relate to the parties' settlement efforts and the amount of another related settlement entered by Render, the undersigned finds them much more in line with what the *Gray v. Deloitte* opinion found the statute prohibits disclosure of—namely, statements like the offers and compromise statements covered by Federal Rule of Evidence 408. Accordingly, Plaintiff's objections to the Court's consideration of DSMF ¶¶ 95 and 96 are **SUSTAINED**.

### C. Procedural Posture

Plaintiff filed this action on September 16, 2024. [Doc. 1.] In its complaint, it asserts three claims under the ADA, alleging (1) that Defendant failed to accommodate Render's disability—which is it described there as "permanent loss of peripheral vision, headaches, blurred vision, and memory loss, related to a stroke and head injury"—by not allowing her to work remotely and by not meaningful engaging Render in an interactive process in relation to her request for an accommodation; (2) that her discharge was the result of disability discrimination; and (3) that her discharge was also retaliation for seeking a reasonable accommodation. [*Id.*, ¶¶ 14, 19-27, 44-61.]

Defendant waived service in September 2024 and answered Plaintiff's complaint on November 18, 2024. [Docs. 2, 3.] The parties filed their joint preliminary report and discovery plan on December 18, and the following day, the Court entered a scheduling order setting the close of discovery for April 17, 2025. [Docs. 5, 8.] On April 7, 2025, shortly before discovery was set to end, the parties moved for a month-and-a-half extension "to request and obtain additional documents from third parties" and to depose multiple witness following the receipt of these third-party documents. [Doc. 20.] That motion was granted. [Doc. 21.] On May 28, 2025, the parties moved for another discovery

extension; while they had made "progress" on discovery matters, they still needed to depose at least two, and possibly as many as five, additional witnesses. [Doc. 25.] Based upon their representations, the parties were granted another discovery extension—this time until July 2, 2025. [Doc. Entry dated May 13, 2025.]

Then, on June 2, 2025—that is, nearly nine months after Plaintiff filed this action and a month-and-a-half after the discovery period was originally set to close—Plaintiff filed a motion for leave to amend. [Doc. 28.] In it, Plaintiff stated that it has "learned that Ms. Render also suffered a spinal injury during a car accident on or around July 1, 2019," which resulted in knee pain, headaches that impacted her ability to view bright lights, constant neck pain, and lower back pain, and that in combination with her stroke and head injury, caused limiting effects on Render that were greater than those initially observed in Plaintiff's complaint. [*Id.* at ¶¶ 3-6.] As a result, Plaintiff asserted, it would "like to amend its Complaint to clarify the extent of Ms. Render's physical impairments." [*Id.* ¶ 7.] However, because Plaintiff failed to demonstrate diligence in pursuing the information forming the substance of its proposed amendment, that motion was denied [Doc. 38], leaving the Plaintiff's allegations and claims focused on the limitations caused by her stroke, as well as her requests for remote work as an

accommodation of those limitations, as the primary bases for this lawsuit, along with her discharge.

On September 24, 2025, Plaintiff moved for partial summary judgment. [Doc. 48.] Following an automatic stay as the result of a government shutdown [*see* Docs. 54, 55, 56], the Court issued a schedule for the remainder of summary judgment briefing [Doc. 59]. Defendant then filed its own motion for summary judgment [Doc. 61], and since then, both motions have been fully briefed and are now ripe for review.

## III. DISCUSSION

In Plaintiff's motion, it seeks summary judgment in its favor on (1) the issue of whether Render was disabled under the ADA, and (2) as to Defendant's Third, Fourth, and Twelfth affirmative defenses pertaining, respectively, to administrative exhaustion, waiver, and estoppel. [*See* Doc. 48-1.]

In Defendant's motion, it argues that it is entitled to summary judgment on each of Plaintiff's claims. [Doc. 62-9.] Defendant first argues that Plaintiff's discrimination claim fails because Render cannot establish either that she was disabled, that Scotch knew she was disabled (or knew of any limitations from her disability), or that she was qualified for the position. [*Id.* at 9-13.] It next argues that her failure to accommodate claim is without merit because (1) her requests

to work remotely were not reasonable, as they did not tie the request to her disability or explain how it would have allowed her to overcome any disabling limitations; (2) her testimony about her requests is inconsistent; and (3) the denial of her remote work request did not subject her to or otherwise result in any adverse employment actions. [*Id.* at 14-19.] Defendant penultimately argues that it is entitled to summary judgment on Plaintiff's retaliation claim (1) because she never engaged in protected activity, as her request was not reasonable; (2) because there is no evidence that Scotch was aware of her protected activity as such; and (3) because there is no evidence of causation. [*Id.* at 20-22.] Finally, Defendant argues that Plaintiff cannot show that its reasons for Render's discharge were pretext for discrimination or retaliation. [*Id.* at 22-23.] Defendant also asserts, in one- and two-paragraph arguments, that Plaintiff's claims are barred by laches and interference with the administrative process. [Doc. 62-9 at 24-25.]

In the discussion that follows, the Court first discusses the ADA framework, then addresses Plaintiff's claims in the order asserted in the complaint—first, the failure to accommodate claim[30]; then, the disability

---

[30] The Court addresses the issues of disability and Render's qualification within this first section, as those issues are outcome determinative of both claims. *See Felix v. Key Largo Mgmt. Corp.*, No. 21-10381, 2021 WL 5037570, at *2 (11th Cir.

discrimination claim; and finally, the retaliation claim. The Court finally takes up the parties' arguments regarding Defendant's affirmative defenses.

### A. The ADA

ADA was designed to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In the employment context, the statute makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a); *see also McCarroll v. Somerby of Mobile, LLC*, 595 F. App'x 897, 899 (11th Cir. 2014). "To establish a prima facie case of disability-based discrimination under the ADA, then, a plaintiff must demonstrate that [s]he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of h[er] disability." *Medearis v. CVS Pharm.*, 92 F. Supp. 3d 1294, 1304 (N.D. Ga. 2014), *report and recommendation adopted*, 92 F. Supp. 3d 1294 (N.D. Ga. 2015).

---

Oct. 29, 2021) (explaining that a plaintiff "must prove that [s]he is disabled to bring either a failure to accommodate or discriminatory termination claim under the ADA.").

Importantly, beyond prohibiting the disparate treatment of employees on the basis of disability, the statute also defines unlawful disability discrimination to include "not making reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)) (cleaned up, marks omitted); *see also id.* ("[An employer] is not insulated from liability under the ADA by treating its non-disabled employees exactly the same as its disabled employees . . . . [Rather,] the very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances.").

Finally, in addition to prohibiting discrimination and requiring reasonable accommodations, the ADA also prohibits retaliation against employees for engaging activity protected by the statute. *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997) (quoting 42 U.S.C. § 12203(a)). To make out a prima facie case of retaliation, a plaintiff must set forth evidence that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the

protected activity. *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). Significantly, seeking or utilizing a reasonable accommodation for a disability—including attempts to engage in the interactive process of discussing an employee's disability and possible accommodations for it—are considered protected activity. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998); *see also Callahan v. Emory Healthcare, Inc.*, No. 1:21-CV-1367-WMR-JSA, 2022 WL 18927486, at *11 (N.D. Ga. Nov. 10, 2022), *report and recommendation adopted*, 2023 WL 2334987 (N.D. Ga. Feb. 16, 2023), *aff'd*, No. 23-10604, 2024 WL 3027684 (11th Cir. June 17, 2024); *Castleberry v. Camden Cnty.*, No. CV 2:16-00128, 2018 WL 4702163, at *13 (S.D. Ga. Sept. 30, 2018) (same).

The undersigned now turns to Plaintiff's claims.

**B. Failure to Accommodate**

As just discussed, the ADA "imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer." *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1526 (11th Cir. 1997); *see also Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022). To survive summary judgment, a plaintiff asserting a failure to accommodate claim must produce evidence that "(1) she

was a qualified individual with a disability; (2) she made a specific request for a reasonable accommodation; and (3) her employer failed to provide a reasonable accommodation, or engage in the requisite interactive process in order to identify a reasonable accommodation." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020) (cleaned up) (citing *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)). Here, the parties dispute whether Render was disabled, whether she was a qualified individual, whether she made a specific request for a reasonable accommodation, and whether she suffered an adverse action. The Court takes up each question below.

**1. Disability**

Defendant contends that Render cannot show she was disabled under the ADA, primarily because "the documentary evidence produced by the EEOC demonstrates Render did not suffer from memory issues during the relevant period [and her] medical records suggest that her vision issues had subsided by the time of her termination." [Doc. 64 at 11; *see also id.* at 11-18.] As to her memory, Defendant observes that treatment records from July 2019 documented her memory as "intact," that her FMLA paperwork fails to note any memory or cognitive issues, and that her November 2019 and January 2020 medical records reported that her memory was normal or intact. [*Id.* at 12-13.] As to her vision,

Defendant acknowledges that there are records suggesting that she suffered peripheral vision loss, but argues that because Render's return to work release did not include vision restrictions; because her chiropractor (who she saw for injuries related to her car accident) noted that her vision was "fine" between September and November 2019; and because Render's neurologist described her vision as "stable" in November 2019, any visions issues had "subsided during the relevant period" and her vision was thus "not impaired at the time of her termination." [*Id.* at 13-16.] Beyond these records, Defendant points out that Render testified that her memory did not impact her ability to do her job, and that Render in fact drove despite her vision issues and may have declined corrective eyewear, arguing that this shows that her memory and vision problems did not substantially limit any major life activity. [*Id.* at 16-18.]

Responding to Defendant, Plaintiff clarifies its position that "Render is disabled . . . because her stroke impacted her major life activity of neural or brain functioning and caused permanent peripheral vision loss." [Doc. 69 at 5-6.] Thus, it does not argue that her memory issues rendered her disabled. As a result, the Court focuses on her stroke and vision problems in deciding whether she can show that she was disabled under the statute. *See Ekokotu v. Fed. Exp. Corp.*, 523

F. App'x 629, 632 (11th Cir. 2013) (finding claims disavowed in response to a motion for summary judgment are abandoned).[31]

A person is "disabled" under the ADA if she (1) suffers from "a physical or mental impairment that substantially limits one or more major life activities"; (2) has "a record of such an impairment"; or (3) has been "regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff proceeds under the first prong here [*see* Compl. ¶ 14 (noting that her stroke resulted in limitations including vision loss)], and so the question is whether it has set forth sufficient evidence that Render's stroke, along with its attendant vision problems, limited a major life activity to a substantial degree. *See also Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (explaining that to establish an actual

[31] All that said, the Court notes that Render has testified that that her memory problems started with her stroke (Render Dep. at 168); that her stroke "interfered [with her] memory" (*id.* at 97); that because of her memory problems, she needed a list to "refresh [her about her daily duties]" with Defendant (*id.* at 42, 98); that her memory problems persist today (and in fact prevented her from remembering the answers to questions at her depositions) (*id.* at 167-68); and that she is embarrassed at not being able to remember things (*id.* at 168). Moreover, Swaney acknowledged that Render was the only Locator to need a checklist of daily tasks (Swaney Dep. at 23) and Scotch explained in Render's separation notice that "We have to remind her of end of day/week to complete tasks that must be performed." [Doc. 48-24.] But whether this shows that Render was substantially limited as compared with the general population is no longer a question for today.

disability, a plaintiff must put forth evidence demonstrating that she had (1) a physical impairment that (2) limits a major life activity to (3) a substantial degree). An impairment is disabling in this fashion if it:

> substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added).[32]

Along these lines, it is important to remember that the ADA Amendments Act of 2008 ("ADAAA") was designed to make it easier for plaintiffs to satisfy these criteria and prove they are disabled. *See Collins v. Dekalb Cnty.*, 824 F. Supp. 3d 1306, 1325 (N.D. Ga. 2026). As a result, the statute, as amended by the ADAAA, provides that the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted . . . ." 42 U.S.C. § 12102(4)(A); *see also* 29 C.F.R. § 1630.1(c)(4). Likewise, the

---

[32] The Eleventh Circuit has directed courts to look to the EEOC's regulations for guidance in interpreting the term "substantially limits." *See Garrett v. Univ. Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1311 (11th Cir. 2007); *see also Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th Cir. 2010) (explaining that, while administrative interpretations of a statute by its enforcing agency are not controlling, courts should still look to them for guidance).

implementing regulations also explain that the "substantially limits" requirement should also be "construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard" 29 C.F.R. § 1630.2(j)(1)(i); *see also id.* § 1630.2(j)(1)(v) (explaining that the disability determination should not normally "require scientific, medical, or statistical analysis"). Finally, the Court is mindful of the Eleventh Circuit's admonition that, following the ADAAA, "an extensive analysis is not required to determine whether an individual's impairment is a disability under the ADA," *United States Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016) (citing *Mazzeo*, 746 F.3d at 1268).

Turning back to the facts of this case, the Court is unable to agree with Defendant's contention that Plaintiff cannot show that Render was disabled. For starters, its argument admittedly depends entirely on ignoring Render's testimony about her stroke[33] and its limiting effects. [*See* Doc. 64 at 12 ("The EEOC has not presented any evidence, outside of Render's self-serving testimony,

[33] Throughout its briefing, Defendant refers to Render's stroke as an "alleged" or "purported" stroke, despite never pointing to any evidence whatsoever that she did not suffer one. It is unclear what purpose this language is mean to serve, other than to insult Render or diminish her misfortune. It is a poor look indeed.

that Render genuinely suffered from memory issues in October 2019."), 14 ("At the very least, these chiropractor records, along with Render's unreliable testimony, create an issue of fact as to whether Render was experiencing . . . peripheral vision issues.").] However, "[n]othing in Rule 56 prohibits an otherwise admissible [declaration] from being self-serving," *United States v. Stein*, 881 F.3d 853, 856 (11th Cir. 2018); *see also Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.") (collecting authority), and Defendant has not identified anything in Render's prior testimony that would render the declaration a sham or otherwise disregardable, *cf. Rodriguez v. Jones Boat Yard, Inc.*, 435 F. App'x 885, 887 (11th Cir. 2011) (citation omitted) ("An affidavit may be stricken as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact and that party attempts thereafter to create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.") (cleaned up); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (self-serving statements may disregarded where they are not based on personal knowledge or are wholly conclusory) (citing *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000)). Thus, contrary to

Defendant's argument, the Court must consider the entire universe of evidence presented, including Render's testimony.

And turning to the full evidence in this case, including Render's testimony, the Court concludes that Plaintiff has set forth sufficient evidence that Render was disabled due to the vision problems she suffered as a result of her stroke to survive summary judgment. Render has testified that she lost vision in her right eye on July 12, 2019 (Render Dep. at 74-75); that she was taken to the hospital because of her loss of vision, dizziness, and headache (*id.*); that testing revealed she had a stroke (*id.* at 76, 78); and that the peripheral vision loss in her right eye appears permanent (*id.* at 94, 104, 162, 169). Beyond this, Render's medical records confirm that she had an acute left occipital stroke [Doc. 52-2 at 100-01]; that she was observed to have vision loss, including a "right temporal hemifield defect" [Doc. 52-3 at 4-5; Doc. 52-2]; and that her neurologist assessed her as having suffered a cerebrovascular accident (that is, a stroke) due to an embolism in the left posterior cerebral artery, which in turn resulted an infarct in that portion of her brain and in right homonymous hemianopsia [Doc. 52-3 at 7-9]. Render testified that as a result of her vision loss, she almost caused a car accident, found driving difficult and scary for the next year-and-a-half, and was unable to view all three monitors at work with Defendant. Additional medical records

from November 2019 also confirm that she still had a defect in her right temporal hemifield from the stroke with residual right homonymous hemianopsia [Doc. 52-3 at 24-28], and records from May 2020 suggest that she was, at that time, using prism glasses to help correct or at least expand her field of view, but that she was "not keen on it" (DSMF ¶ 86).

Based upon this, the Court concludes that Plaintiff can show that Render was disabled under the ADA because the evidence shows that her stroke resulted in a defect in her brain that substantially limited her sight[34] and continues to do so. More specifically, Plaintiff has put forth detailed evidence that Render's vision problems are the result of the right temporal defect caused by the stroke; that the loss of her right peripheral vision is continuous and permanent; and that her vision loss is bad enough to make driving difficult and prevented her from seeing all of her monitors at work. This is enough to allow a reasonable factfinder to conclude that she was substantially limited in her ability to see as compared to the general population. *See Felix*, 2021 WL 5037570 at *3 ("Felix explained (1) his diabetic retinopathy, (2) the damage to his retinas, and (3) the extent that this

[34] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, *seeing*, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A) (emphasis added).

limited his sight," namely, that he could perform his job but could not drive at night; and so "[h]is diabetic retinopathy thus qualifies as a disability."); *see also Lewis v. Georgia Power Co.*, No. 1:19-CV-173 (LAG), 2022 WL 1401720, at *7 (M.D. Ga. Mar. 29, 2022) ("Plaintiff asserts that his monocular vision causes him to have 'no peripheral vision' in his right eye, 'substantially limits his ability to see,' and 'affects his depth perception and balance.' . . . [He] arguably has a disability within the meaning of the ADA."), *aff'd*, No. 22-11395, 2023 WL 1818924 (11th Cir. Feb. 8, 2023); *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, No. 2:17-CV-01649-MHH, 2022 WL 2959569, at *11 (N.D. Ala. July 26, 2022) (holding that plaintiff with an "inability to see straight ahead with his right eye" due to monocular vision, which resulted "in loss of depth perception and visual field" had created material issue of fact as to whether he was disabled).

Defendant's argument that "Render's vision was not impaired at the time of her termination" is unavailing. To start, the documentary evidence it cites in support is fairly equivocal. First, it seeks to make much of Render's chiropractic records that suggest her vision improved [*see* Doc. 64 at 14]; however, as noted in the factual recitation, her chiropractor, the author of those records, has specifically disclaimed the significance of those notations, testifying that they reflect only his own subjective evaluation and that they were not meant to be a

clinical evaluation of her sight (*See* Steingraber Decl. ¶¶ 9-17). Next, Defendant notes that November 2019 neurology records indicate that Render's vision was "stable." [Doc. 64 at 15.] But of course, that her vision was stable does not mean that it was improved, and the neurologist seemingly acknowledged as much on the same page Defendant cites. [*See* Doc. 52-3 at 23 (on page where neurologist called Render's vision "stable," neurologist also wrote "She is tearful today. She states her vision is the same since hospitalization."), 24 (noting vision loss), 25 (noting right temporal hemifield defect during cranial nerve testing).] Finally, Defendant speculates that Render had a second stroke in January 2020 that recreated or worsened her vision problems, based upon a single record from January 2020, where Render's provider was *concerned* that she might have had a second stroke [Doc. 64 at 15]; but (1) Defendant has not cited any records actually confirming she had a second stroke, (2) Render has denied having a second stroke (DSMF ¶ 85), (3) Render's additional records show that a CT scan at the time was negative for any acute findings (while still showing the chronic left occipital lobe infarct from her first stroke) [Doc. 70-6], and (4) during a neurological visit in May 2020, her provider noted no further reports of strokes or migraines (DSMF ¶ 86).

Seemingly acknowledging that Plaintiff has put forth substantial evidence that "Render's stroke interfered with . . . 'seeing'" throughout the relevant period and beyond, Defendant also argues that any limitation was, in fact, "the result of Render's failure to pursue minimal treatment" in the form of prism lenses, and that the Court, in weighing the limiting effects of the loss of her peripheral vision, must consider whether prism lenses would have ameliorated or otherwise mitigated those limitations. [Doc. 64 at 17-18.] Although Defendant acknowledges that the ADA instructs that the determination of whether an impairment substantially limits a major life activity must normally be made "without regard to the ameliorative effects of mitigating measures," *see* 42 U.S.C. § 12102(4)(E)(i), it nevertheless contends that prism lenses fall within a small exception to this rule, which states "the ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses *shall be* considered in determining whether an impairment substantially limits a major life activity," *id.* § 12102(4)(E)(ii) (emphasis added).[35]

[35] Defendant cites to the ADA regulations rather than the statutory text as the Court does here, but it is a difference without distinction in this instance, as the two precisely mirror one another. [*See* Doc. 64 at 17-18.]

The problem for Defendant's argument is that it apparently did not read any further. The very next section clarifies that "the term 'ordinary eyeglasses or contact lenses' means lenses that are intended to fully correct visual acuity or eliminate refractive error." *Id.* § 12102(4)(E)(iii)(I).[36] Of course, Render does not contend that she was disabled due to any acuity or refractive errors in her vision; instead, the evidence shows that she lost her peripheral vision due to the damage that the stroke caused to her brain. Along these lines, during her August 8, 2019 neurology exam, Render's neurologist observed and evaluated her "Visual Acuity" separately from her "Visual Fields," with the latter being what was impaired by her stroke. [*See* Doc. 52-3 at 6.] And prism glasses would not have corrected any visual acuity or refractive error in her eyes (instead it would have served to widen her field of view), and thus, need not be considered in evaluating the visual limitations caused by the defect in Render's right temporal hemifield

[36] Rather than read the statutory text to find the answer, Defendant cites to *Thousand v. Wrest*, a *pro se* prisoner case alleging violations of 42 U.S.C. § 1983, in part based on the denial of medical treatment. *See* No. 14-CV-06616-CJS, 2016 WL 3477242, at *4 (W.D.N.Y. June 27, 2016). It had nothing to do with the ADA or its text, and in its brief mention of prism lenses, it actually noted that they were a "special" sort of lens, and never suggested they were or were analogous to "ordinary eyeglasses." *Id.* at *4, *5.

from her stroke and resulting in right homonymous hemianopsia.[37] And ignoring such effect, for the reasons already explained, Plaintiff has established that the right temporal defect, or infarct, in Render's brain has resulted in right homonymous hemianopsia that limits her ability to see to a substantial degree. Thus, Defendant's argument, that Plaintiff cannot establish that Render was disabled under the ADA, is without merit, and its motion should be **DENIED** on this ground.

As to Plaintiff's countervailing request for summary judgment in its favor on the issue of disability, although it is an extremely close call (unlike Defendant's request on the issue of disability), the undersigned cannot ultimately agree that summary judgment is warranted in Plaintiff's favor either. There is no genuine dispute that Render suffered a stroke and that her vision was impaired. But at the same time, her chiropractor did indeed make repeated evaluations of her vision over a period of time and observed significant improvement through

---

[37] Because they are clearly not within the exception for "ordinary eyeglasses," the Court need not decide if prism lenses are in fact "low vision devices" that the ADA specifically directs should *not* be considered in determining the limiting effects of a person's impairment, and need not analyze any comparison of Render's condition to monocular vision. [*See* Doc. 48-1 at 15 n.4 (citing, among other things, 42 U.S.C. § 1202(4)(E)(i) (regarding low vision devices) and EEOC Technical Assistance Document (regarding monocular vision).]

October 2019 [*see, e.g.*, Doc. 61-3 at 39 ("headaches, 50% better," and "[v]ision is improving"), 41 (same), 49 ("headaches, 75% better," and "[v]ision is fine now"), 55 ("[n]o headaches," and "[v]ision is fine"), 56 (same), 57 (same), 59 ("[n]o pain or functional limitations")], and the chiropractor's subsequent explanation of those observations as being nothing more than "subjective" evaluations is significantly underdeveloped, to the point that a factfinder could call the explanation into question (not that it must). Likewise, Render was driving within a short period of time, despite her stated concerns with her vision and the safety of doing so. Other medical records also reflect some fluctuation in the extent of her vision loss. And, in the end, Plaintiff has not actually directed the Court to testimony or evidence establishing the specific extent to which Render has lost her peripheral vision—that is, it remains unclear exactly how much of her visual field was lost. Given these pieces of conflicting evidence and the lack of evidence about the full extent of her vision loss, the Court cannot agree that there no genuine issue of fact over whether her stroke ultimately resulted in substantially limiting vision loss. Accordingly, Plaintiff's motion should also be **DENIED** on the issue of disability.

**2. Qualification**

Defendant next argues that Render was not a "qualified individual" under the ADA, because "she performed her job duties at an unacceptable level both before and after returning from leave," and because she was unable to "to work her full time schedule." [Doc. 62-9 at 10-11.] Plaintiff counters that because Render worked in the Locator position for more than a year, received a favorable performance review months before she was fired, and performed better than at least some other Locators during that period of time, she has at least created a genuine issue of fact about whether she was qualified. [Doc. 70 at 8-9 (citing *Cooper v. Walker County E-911*, No. 6:16-CV-1746-TMP, 2018 WL 3585217, *11 (N.D. Ala. 2018)).] The undersigned agrees with Plaintiff.

Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position" at issue. 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m) (defining a qualified individual as one who "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."). Thus, a plaintiff "must show either that [s]he can perform the essential functions of his

job without accommodation, or, failing that, show that [s]he can perform the essential functions of h[er] job with a reasonable accommodation." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (citing *Holbrook*, 112 F.3d at 1526); *see also Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 942-43 (11th Cir. 2017). If a plaintiff, however, "is unable to perform an essential function of [her] . . . job, even with an accommodation, [s]he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Davis*, 205 F.3d at 1305 (citing *Cramer v. Florida*, 117 F.3d 1258, 1264 (11th Cir. 1997)). Whether a function is essential is evaluated through a fact-intensive process on a case-by-case-basis, and is a question of fact that is not typically suited for resolution on a motion for summary judgment. *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014).

Defendant's argument for summary judgment on this issue fails for two reasons. First, it does not ever identify—certainly not with any citation to evidence or in any precise way whatsoever—what the essential functions of the Locator position were, much less measure Render against those. Instead, it merely argues by assertion that *relatively* good production numbers and *unspecified* good attendance are both "essential functions" that Render was incapable of [*see* Doc. 62-9 at 10-11], all without ever explaining *why* these were

essential functions, *what* the minimum requirements were to meet these essential functions, or *how* Render failed to meet those requirements.[38] *See Barton v. Tampa Elec. Co.*, No. 95-1986-CIV-T-17E, 1997 WL 128158, at *3 (M.D. Fla. Mar. 11, 1997) (denying summary judgment because genuine issues of fact remained after defendant "failed to produce any documentation to this Court as to what the essential job functions are and where they are laid out and defined for the [p]laintiff."); *see also Holly*, 492 F.3d at 1257–61 (concluding that fact issues existed as to whether strict punctuality was an essential job function).

More specifically, as to performance, Defendant merely compares Render's metrics to those of other Locators, without identifying any *minimum* metrics required to meet its otherwise unexplained requirements. And contrary to Defendant's argument, on various occasions noted in the factual background section, Render in fact exceeded the production figures of other Locators, and Scotch never issued any disciplinary write-up regarding her performance before her discharge, despite explaining that it was his policy to engage in progressive discipline. Given Defendant's failure to identify any objective performance

---

[38] Compounding this, Defendant does not even address the issue of whether Render was a qualified individual in its reply brief. [*See generally* Doc. 71.]

metrics or show that Render failed to meet them, the Court cannot say there is no dispute of fact over her performance qualifications.

Similarly, Defendant does not identify any attendance requirements in arguing that Render was unqualified, and instead, simply cites to *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994), to suggest that predictable in-person attendance is always an essential qualification. The problem for Defendant's argument is that *Jackson* merely states that many jobs, such as housekeeping, "by their very nature must be performed daily at a specific location," and therefore necessarily include "being present on the job" as an essential qualification. *Id.* at 279. But Defendant has not established that in-office attendance was an essential function of the Locator position, merely that it preferred it after an unsuccessful run in 2018. And even if the attendance policy [*see* Doc. 70-1] includes some guidance, it is undisputed that Render never received discipline under the policy. And to the contrary, there is evidence that both before and after her discharge, Locators were allowed to work remotely. And Render sought to do exactly that—work remotely—to accommodate her vision issues and associated driving problems. In these circumstances, there remain genuine issues of fact that preclude summary judgment to Defendant on these bases. *Cf. Birmingham v. Hyundai Motor Mfg. of Ala., LLC*, No. 2:23-CV-737-

KFP, 2025 WL 725734, at *5 (M.D. Ala. Mar. 6, 2025) (explain that "'attendance' can be an essential function of a job," at least "when evidence is introduced that supports that finding"), *aff'd*, No. 25-10938, 2026 WL 893743 (11th Cir. Apr. 1, 2026).

Second, Render in fact began working for Defendant as a temporary employee for some time before being hired on as a full-time Locator in March 2018; worked in the Locator position for roughly a year-and-a-half in 2018 and 2019; and received a "performance meets standards" in February 2019. In the absence of other evidence establishing she was not qualified, this is sufficient to create a genuine issue of fact at summary judgment. *See Nix v. McMaster Carr Supply Co.*, No. 1:17-CV-2785-SCJ-JFK, 2018 WL 7348862, at *18 (N.D. Ga. Dec. 27, 2018) (denying summary judgment to employer on qualification issue, "especially given the fact that Plaintiff actually performed the job"), *report and recommendation adopted*, 2019 WL 1493704 (N.D. Ga. Feb. 11, 2019); *Cooper*, 2018 WL 3585217, at *11 ("An employee with a disability who actually has performed in the desired position for several years should be deemed to be a qualified individual.").

In the end, because Defendant has failed to establish with any precision what the essential functions of the Locator position were and/or why Render

could not perform those functions, and because she in fact worked in the Locator position for well over a year with a satisfactory review, genuine issues of fact remain about whether she was "qualified," and Defendant's motion is due to be **DENIED** on this basis.

The Court now turns to the substance of Plaintiff's first claim—namely, whether Defendant failed to accommodate her disability.

### 3. Failure to Accommodate

As discussed above, to survive summary judgment on a failure to accommodate claim, in addition to showing that she was disabled and qualified, a plaintiff must have evidence that she made a specific request for an accommodation *and* that her employer failed to provide a reasonable accommodation or engage in the requisite interactive process to identify one. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020). On the request side, the initial burden is on the employee to (1) "identify—at least in broad strokes—the limitations her mental or physical condition imposes," and (2) "link her disability to her requested accommodation by explaining how the requested accommodation could alleviate the workplace challenges posed by her specific disability." *Owens*, 52 F.4th at 1335 (citing *Frazier-White v. Gee*, 818 F.3d

1249, 1255-56 (11th Cir. 2016)).[39] "Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999)). "The bottom line is that employees must give employers enough information to respond effectively to an accommodation request." *Owens*, 52 F.4th at 1334. Only after the employee provides this information must the employer "initiate an informal, interactive process" with the employee to discuss her specific limitations, explore potential accommodations, and select the most appropriate accommodation for both the employer and the employee. *Id.* at 1334 (quoting 29 C.F.R. § 1630.2(o)(3) and collecting other authority). "The type and extent of information that an employee must provide will depend, of course, on the particulars of each case," and "may often be obvious," but is, in any event, usually a "modest" burden. *Id.* at 1335-36.

In its complaint, Plaintiff alleges that Render made two accommodation requests: first, in August 2019, before returning from FMLA leave, she reached

---

[39] "Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) (citation omitted).

out to a supervisor to request to work from home because she could not drive; and second, in September 2019, shortly after returning to work, Render again asked to work from home to avoid having to obtain rides to work and medical appointments. [Compl. ¶¶ 22-27.]

Defendant argues that the first request was not a request for a reasonable accommodation of her disability because it neither (1) identified her disability or the limitations it imposed, nor (2) explained how the proposed accommodation would help her overcome those limitations. [Doc. 62-9 at 14-16.] Plaintiff counters, however, that, at least as to the first request, Scotch was responsible for the "breakdown in the interactive process by asking no follow up questions . . . despite knowing the request was related to her health." [Doc. 70 at 14-15.] On this point, the Court is constrained to agree with Defendant.

As discussed, the Eleventh Circuit has held that "to trigger an employer's duty to provide a reasonable accommodation," an employee must first made a *specific* demand for an accommodation that (1) *identifies* the disability and/or its limitations and (2) *explains* how the requested accommodation would help with those limitations. *Owens*, 52 F.4th at 1334-35; *Change v. Midtown Neurology, P.C.*, No. 1:19-CV-885-SC-JAJB, 2021 WL 2483368, at *16 (N.D. Ga. Feb. 3, 2021) ("The request for accommodation must also be direct, specific, and identify how it is

linked to a disability."), *report and recommendation adopted*, 2021 WL 2492470 (N.D. Ga. Mar. 26, 2021), *aff'd*, No. 21-11405, 2022 WL 2352339 (11th Cir. June 29, 2022). This also holds true for purposes of triggering an employer's obligation to engage in the interactive process; if a plaintiff fails to make a specific request for an accommodation that is tied to her disability, "the employer's lack of investigation into [a] reasonable accommodation is unimportant." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (citation omitted); *see also Spears v. Creel*, 607 F. App'x 943, 948 (11th Cir. 2015) (holding that employer has no affirmative duty to engage in an "interactive process" if employee has not met her burden of identifying a reasonable accommodation); *Knowles v. Sheriff*, 460 F. App'x 833, 835 (11th Cir. 2012) (same).

In this first instance, Render testified that she merely asked Swaney if she could work remotely, and Render admitted that she did not provide any basis for the request. (DSMF ¶ 37; *see also* Render Dep. at 85-86.) On Defendant's telling, meanwhile, Render asked Scotch for permission to work remotely, but again, did not provide any information about her disability or its limitations and only explained that remote work would be "easier" for her. (*See* Defendant's Resps. to Pl. Interrogs. at Resp. No. 14; Scotch Dep. at 36, 38-39, 49.) Unfortunately for Plaintiff, this does not meet her burden in requesting a

reasonable accommodation, because she neither (1) identified her disability—a stroke, infarct, or homonymous hemianopsia—or the limitations from it—loss of vision, inability to drive safely or independently—nor (2) explained how the accommodation would help alleviate those limitations. And without including that information as part of her accommodation request, Defendant was under no obligation to provide the accommodation or even engage in the interactive process.[40] *See Owens*, 52 F.4th at 1337 ("Having failed to identify a disability, Owens also failed to explain to GOSA why teleworking would accommodate her disability."); *see also Earl*, 207 F.3d at 1367.

Moreover, the information that Scotch and Swaney had about Render's health, which they obtained separately from this first request[41]—that she went to the hospital, was out on FMLA leave, and had health issues—also does not speak to her specific disability or its limitations and therefore amounts to nothing but "[v]ague or conclusory [information] revealing an unspecified incapacity," which is "not sufficient to put an employer on notice of its obligations under the

[40] Notably, too, while Render followed Defendant's policies for seeking FMLA leave, she completely disregarded those in seeking accommodations for her disability. (*See* PSMF ¶ 36; *see also* Hamlett Dep., Ex. 1 (ADA policy).)

[41] And thus, would not have triggered Defendant's accommodation obligations anyway. *Owens*, 52 F.4th at 1334-35.

ADA." *Morisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir. 1996) (knowledge of illiteracy and special education courses insufficient to trigger employer's responsibilities); *see also id.* (finding a case instructive, in which statement that candidate had "minuscule brain damage to the perceptual and sensory-motor areas of the brain" in reference to cerebral palsy was found to be "devoid of any substantive content" about the limitations resulting from any disability) (citing *Pridemore v. Rural Legal Aid Society of W. Cent., Ohio*, 625 F. Supp. 1180 (S.D. Ohio 1985).) As a result, the Court cannot agree that their knowledge that Render had *some* health issues meant that they were obligated to engage in an interactive process at that time. And "[b]ecause such information is not enough to trigger an employer's duties under the [ADA, Plaintiff's] claim that [Defendant] discriminated against [Render] by failing to provide her reasonable accommodations fails as a matter of law," and any breakdown in the interactive process is unimportant. *Owens*, 52 F.4th at 1337. Accordingly, summary judgment should be **GRANTED** in Defendant's favor on Plaintiff's first request for an accommodation.

Render's second request for an accommodation is another story. According to Render,[42] upon her return from FMLA, she specifically asked Swaney if she could work remotely because she was scared to drive due to the vision issues caused by her stroke. (DSMF ¶ 41; *see also* Render Dep. at 85-86, 88, 134-36.) That is, Plaintiff identified her disability and its limitations—her stroke and vision problems, as well as the resultant issues driving—and asked for an accommodation that would address those limitations—working remotely so she would not have to drive or burden someone else with driving her.

Sensing that this testimony precludes summary judgment in its favor, Defendant goes on to argue that Render's testimony here should be disregarded as "inconsistent." [Doc. 62-9 at 16-17.] In particular, Defendant protests (1) that while Render admittedly testified that she made the foregoing request, she also testified that she did not remember discussing with Swaney how she was getting to work or whether she was getting rides; and (2) that Plaintiff's complaint in this case also mentioned her therapy appointments as a reason she sought to work remotely. [*Id.* (citing *United States v. Davis*, 809 F.2d 1509, 1513 (11th Cir. 1987)).] But this is not enough for the Court to disregard Render's testimony.

[42] Whose testimony the Court must credit as the non-movant on this issue.

As to the first, in the undersigned's view, there is no inconsistency. Render testified that she told Swaney about the stroke, her vision problems, and driving issues, and requested to work remotely; separately, she also testified that the two did not discuss how Render was getting to work. But just because they did not discuss the minutiae of Render present commute options, it does not follow that Render did not still identify her stroke, explain that she had vision and driving problems, and request to work remotely as a result. Moreover, once Render made her request, it would have triggered Defendant's accommodation duties; at that point, if anything, Defendant should have been affirmatively engaging Render on how she was getting to work and what options existed to accommodate her vision and driving limitations. Regardless, Render's statements are not, as Defendant's citation requires to disregard them, "so fantastic, so internally inconsistent, or so speculative that [they have] no probative value." *Davis*, 809 F.2d at 1513.

As for the complaint's allegation that Render altered her second request to work remotely to align with the dates she had physical therapy [*see* Doc. 1 ¶ 26], it also fails to directly conflict with Render's testimony about the request she made to Swaney. As Render states and Plaintiff presents it, Render was scared of driving due to the loss of her peripheral vision for at least a year-and-a-half

after her stroke, and so working from home on the dates she would otherwise have had to drive more than twice as far as usual—that is, to work, to therapy, to work again, and then home—is entirely consistent with seeking to drive as little as possible,[43] especially if, as the parties seem to agree, Render's earlier request for unrestricted remote work was denied. As a result, the Court will consider Render's testimony about the accommodation request she made of Swaney, which, for the reasons explained, fulfills the necessary requirements for seeking an accommodation.

Defendant argues that even if the Court considers Render's testimony, her claim fails because she did not request a "*reasonable* accommodation," because her request "was based on personal convenience, not any medical necessity," as she in fact drove to work and nothing in her medical paperwork prevented her from doing so. [Doc. 62-9 at 17.] The undersigned cannot agree. Plaintiff has presented overwhelming medical evidence that she lost her peripheral vision, and has testified that the vision loss made her scared to drive; that she almost

[43] According to the complaint and Render's testimony, her therapy appointments were close to her house but roughly an hour from Defendant's office. [Doc. 1 ¶ 23; Render Dep. at 89-90.] Accordingly, working remotely on days she had therapy would presumably have saved Render roughly three or four hours of time driving—unsafely—from her home to work, from work to therapy, from therapy back to work, and then from work to her home.

caused a car collision due to her vision problems in August 2019; and that, at least early on and during the relevant period, she had someone follow her to work and back home to ensure she arrived safely. (Render Dep. at 86-87, 97-98, 135-36.) Moreover, whether or not it was safe course of action, Render only began driving alone to avoid disturbing or otherwise burdening others who supervised her driving (*id.* at 89); testified that it took a year-and-a-half to become comfortable driving (*id.* at 162-63); and testified that she still does not drive "often" and has to be very careful when she does so (*id.* at 165-66). The undersigned therefore cannot agree with Defendant's assessment that the record evidence shows that her request was merely for personal convenience.

Accordingly, since there is evidence that Render "identif[ied] a statutory disability and explain[ed] generally how a particular accommodation would assist her," her second request triggered Defendant's obligations to engage in the interactive process to find a reasonable accommodation. *Owens*, 52 F.4th at 1336; *id.* (noting further that "we expect an employee's informational burden [in making a request] to be modest"); *see also Pozo v. Vilsack*, No. 19-00352-CV-W-GAF, 2022 WL 22884504, at *16 (W.D. Mo. Mar. 11, 2022) ("Denying a telework accommodation on the premise that Plaintiff can secure a ride to work every day from a family member is unreasonable and unrealistic for both Plaintiff and the

unnamed family member."). And further, because there appears to be no dispute that Defendant denied all of Render's requests for remote work and did not further engage her about accommodating her vision and driving problems, Plaintiff has created at least a material issue of fact about whether Defendant failed to accommodate her disability or was otherwise responsible for the breakdown in the interactive process. *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *16 (N.D. Ala. Sept. 17, 2020) (stating that "it is for a jury to decide whether Defendant improperly limited the [accommodation] on account of his disability and whether Defendant failed in its duties to engage in the interactive process"); *see also Cooke v. Carpenter Tech. Corp.*, No. 20-14604, 2022 WL 17730393, at *2 (11th Cir. Dec. 16, 2022) ("But viewing the evidence in light most favorable to Cooke, Carpenter Technology refused to consider any accommodation beyond the 30-day period."). Accordingly, Defendant's motion should be **DENIED** on this basis.

#### 4. Adverse Action

Finally, Defendant argues that even if it failed to accommodate Render, her accommodation claim still fails "because Render was not subjected to any adverse employment action *because of* the alleged failure to accommodate her requests." [Doc. 62-9 at 18-19.] Although Defendant acknowledges discharging

her, it urges that Render's employment was terminated solely motivated by "her poor performance." [*Id.* at 18.]

It is true that "discrimination in the form of a failure to reasonably accommodate is actionable under the ADA only if that failure negatively impacts" the employee's terms and conditions of employment. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) (citing 2 U.S.C. § 12112(a)); *Holly*, 492 F.3d at 1263 n.17. But Defendant's argument that Render suffered no negative impact from the denial of her remote work request flounders for two reasons.

First and most significantly, if Render had been allowed to work remotely, a reasonable factfinder could conclude that her attendance (even if remote) would have improved, and with it, her performance, at least in terms of her overall pole completion rate, since she would be present at work more often. Indeed, along these lines, Scotch testified in his declaration that Render's firing was not just motivated by her poor performance, but also by her "poor attendance," which relates directly to her ability to get to and from work, goes directly to the denial of her requested accommodation, and likely would have been alleviated—at least to some extent—if the request had been granted. (Scotch Decl. ¶ 21; *see also* Scotch Dep. at 41-42.) A reasonable factfinder could therefore

conclude that had Render been allowed to work remotely, she might not have been in line to be discharged the next month.

Beyond that, there is evidence calling into question Defendant's stated reasons for her discharge. To start, while Defendant now asserts, in relation to the present argument, that she was fired solely due to poor performance, it is undisputed that she was never formally reprimanded for her performance and that Scotch did not mention it during her separation meeting. (Scotch Dep. at 41; Render Dep. at 164; *see also* PSMF ¶ 51.) Furthermore, Render testified that Scotch never even counseled her about her work performance, despite Scotch and Hamlett testifying that it was their practice to utilize progressive discipline (and that skipping written discipline was only appropriate for "gross misconduct" and other "egregious circumstances"). (Render Dep. at 164; Scotch Dep. at 28; Hamlett Dep. at 88-89.) Beyond this, Render was discharged within six weeks making a remote work request that Scotch admittedly knew was connected to her personal health. Even if that request did not fit the formal requirements for a reasonable accommodation request under the ADA and is therefore not actionable in that sense, the close temporal proximity is still suggestive that the request and her health played some role in her discharge, further calling into question Defendant's stated justification that Render's performance alone, and

not also her need for assistance, resulted in her discharge. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *see also Summers v. City of Dothan*, 444 F. App'x 346, 351 (11th Cir. 2011); *cf. Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011) (a "two-month gap may be 'closer' in time, but it is not 'very close'").

In the end, this evidence—essentially, that the denial of Render's accommodation request and the refusal to engage her in an interactive process to identify a reasonable accommodation likely served to accelerate the events leading to her discharge, and that engaging her in an interactive process to identify reasons accommodations might have helped he remain in her position—is enough to create at least a genuine issue of material fact about whether the denial of Render's remote work request negatively impacted the terms and conditions of her employment. As a result, Defendant's final argument on this claim fails, and its motion for summary judgment should be **DENIED** with regard to Plaintiff's failure accommodate claim as it relates to her second, post-FMLA request to Swaney.

The Court now takes up Plaintiff's disparate treatment and retaliation claims.

### C. Disability Discrimination

As noted above, to prevail on an ADA disparate treatment discrimination claim under the traditional *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case by setting forth evidence that (1) she has a disability, (2) she was a "qualified individual" at the relevant time, and (3) she was subject to unlawful discrimination because of her disability. *Beasley*, 69 F.4th at 754. If the plaintiff is successful in making a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision. *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (citing *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1216 (11th Cir. 2021)). If it does so, the burden then shifts back to the plaintiff to present sufficient evidence creating a genuine issue of material fact that the defendant's reason is pretext for discrimination. *Id.*

Defendant argues that Plaintiff cannot establish any element of a prima facie case of discrimination under the *McDonnell Douglas* approach. [*See* Doc. 62-9 at 10-13.] The Court has already addressed its arguments that Plaintiff cannot show that Render was disabled or qualified, and found them wanting. But Defendant also contends that Plaintiff cannot demonstrate the third element, causation, because Scotch—who was undisputedly the decisionmaker for

Render's discharge—was not aware of her disability or the limitations associated with it when he made the decision to terminate her employment. [Doc. 62-9 at 12-13 (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005) ("[A] decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee 'because of' that disability.")).] *See also Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.").

The relevant evidence is mixed. It is undisputed that Render never spoke to Scotch about her disability or its limitations (Render Dep. at 88) and that Scotch has testified that he was "not aware of any medical impairment" Render had (Scotch Decl. ¶ 21). At the same time, it is also undisputed that Swaney informed him that Render left work in an ambulance (PSMF ¶ 21), that he knew Render was subsequently out for nearly two months on FMLA leave (PSMF ¶¶ 33, 34), and that he understood that Render requested to work remotely upon her return for reasons he knew related to her health (*see* Scotch Dep. at 38-39, 49) [*see also* Doc. 48-7 at Resp. No. 14]. Render has also testified that she disclosed her disability and its limitations when she spoke with Swaney about her remote work request (DSMF ¶ 41; *see also* Render Dep. at 88, 134-36); and that Swaney and Scotch spoke about Locators' performance and any ongoing performance issues.

(*See* Swaney Dep. at 12-14, 20-21, 40-41; *see also* Scotch Dep. at 16-17). In other words, Defendant has presented direct and unequivocal testimonial evidence that Scotch was not aware of Render's disability (which Render admits she did not disclose to him), and Plaintiff has set forth circumstantial evidence that Scotch *may* have been aware.

While knowledge "can be established by circumstantial evidence," see *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000), Plaintiff's evidence here is insufficient to carry the day. To start with Scotch's knowledge that Render had *some* health issue, "courts have held that limited information that a plaintiff has a medical condition or receives medical treatment is not enough to demonstrate a decisionmaker's actual knowledge of a disability for ADA purposes." *U.S. Equal Emp. Opportunity Comm'n v. Princess Martha, LLC*, No. 8:22-CV-2182-CEH-AAS, 2024 WL 4302359, at *9 (M.D. Fla. Sept. 26, 2024) (statement that plaintiff was on multiple medications did not provide notice she was disabled); *see also Morisky*, 80 F.3d at 448 (knowledge that plaintiff was illiterate and had taken special education courses did not put employer on notice of developmental disorder); *Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1220 (M.D. Fla. 2017) (plaintiff's statement that he was "dealing with 'a ton of anxiety'. . . that made it difficult for him to perform his duties at work" did not establish

knowledge of a mental disability); *Moreira v. Am. Airlines, Inc.*, 157 F. Supp. 3d 1208, 1215-16 (S.D. Fla. 2016) (statement that plaintiff was going to physical therapy did not put decisionmaker on notice of disability); *Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1294 (M.D. Ala. 2012) (decisionmaker's knowledge that plaintiff had Graves' disease did not put him on notice that the diagnosis would render plaintiff disabled), *aff'd*, 550 F. App'x 748 (11th Cir. 2013); *Lewis v. Zilog*, 908 F. Supp. 931, 948-50 (N.D. Ga. 1995) (finding supervisor's generalized knowledge that plaintiff had "some sort of medical condition related to stress" did not establish employer's awareness of specific disability). So "just because an employer knows an employee has some sort of impairment doesn't mean that the employer automatically knows the impairment substantially limits a major life activity of that employee." *Howard*, 886 F. Supp. 2d at 1294. And the same holds in this case. Just because Scotch was aware Render had health problems does not mean that he knew she was substantially limited in any particular major life activity, and it is undisputed that Render never informed him.

Next, Swaney's actual knowledge of Render's disability cannot be imputed to Scotch under these circumstances. As the Eleventh Circuit has explained it, in the face of a clear denial of knowledge by the decisionmaker—and in this case, that denial is largely corroborated by Render's admission that she did not inform

Scotch[44]—a plaintiff cannot withstand summary judgment through conjecture about what the decisionmaker *might* have been told; instead the plaintiff must provide evidence that allows for the reasonable inference that the decisionmaker actually had knowledge. On this point, two Circuit Court decisions appear to control what sort of circumstantial evidence suffices in these situations. First, in *Clover v. Total System Services, Inc.*, the Circuit explained that evidence that the decisionmaker spoke with a person who knew about protected activity[45] before taking an adverse action was insufficient because any inference that the knowledge was in fact shared amounted to "pure speculation," because "'could have told' is not the same as 'did tell.'" 176 F.3d 1346, 1355 (11th Cir. 1999). Then, in *Martin v. Financial Asset Management Systems, Inc.*, it further explained that "even though the plaintiff presented evidence of a conversation between the decisionmaker and a senior HR official in the period between the plaintiff's protected conduct and her termination the very next day," the evidence merely

[44] Furthermore, Swaney herself denies having knowledge (Swaney Dep. at 30, 36), and by necessary extension, denies having shared it with Scotch.

[45] The Court finds these employment cases, in which knowledge of a protected activity is key to the resolution of a discrimination or retaliation claim, sufficiently analogous to be controlling here, since the only issue is whether the relevant decisionmaker was aware of a fact—whether disability status or protected activity—that could implicate unlawful bias in the decision-making process.

shows that the HR official "could have told" the decisionmaker, not that she did; and that the other circumstantial evidence—including a policy requiring disclosure of that information, knowledge of plaintiff's prior discrimination complaints; knowledge of an email detailing plaintiff's complaints (though not about discrimination), and the temporal proximity between the conversation with HR and plaintiff's discharge—did not change the equation in the face of the decisionmaker's direct denial. 959 F.3d 1048, 1054-55 (11th Cir. 2020). The undersigned is constrained to follow this guidance. Scotch and Render are both in agreement that she never disclosed her disability or its accompanying limitations to Scotch (and Swaney denies doing so), and the circumstantial evidence that he may have uncovered such information—that he knew Render had health issues, that he spoke with Swaney about Render's performance, and that she was discharged soon (though not very soon) after disclosing her disability—is no more convincing than the evidence put forth in *Martin*. Accordingly, because Plaintiff's evidence merely shows that it is *possible* Scotch had knowledge that Render was disabled, the *Martin* decision instructs that it is insufficient to overcome Scotch's denial of knowledge, Render's admission that she never shared information about her disability with Scotch, and Swaney's denial that she shared any such information. The Court therefore concludes that

Plaintiff cannot establish a prima facie case of disability discrimination under the *McDonnell Douglas* framework.

The undersigned next addresses Plaintiff's retaliation claim before turning to whether the wrongful discharge claims may nevertheless survive under a convincing mosaic approach.

**D. Retaliation**

As noted, to make out a prima facie case of retaliation under the *McDonnell Douglas* framework, a plaintiff must set forth evidence that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. *Batson*, 897 F.3d at 1329. As with Plaintiff's disparate treatment claim, Defendant again argues that it cannot establish the third element because "Scotch was not aware of any alleged protected activity when he made the decision to terminate [Render's] employment."[46] [*See* Doc. 62-9 at 19-22.] Plaintiff, meanwhile, counters that Scotch knew of the August telework request, that he was copied on

[46] Defendant also argues that Render did not engage in any protected activity whatsoever, but as shown above, there is at least a genuine issue of fact about whether she requested a reasonable accommodation in asking Swaney to work remotely to accommodate her vision and driving problems. As a result, there is also a genuine dispute about whether she engaged in protected activity. *See Standard*, 161 F.3d at 1328; *Callahan*, 2022 WL 18927486 at *11.

the email sending Render her daily checklist, that Scotch discussed Render's performance with Swaney, and that there is close temporal proximity between her protected activity and the decision to discharge Render (more specifically, 45 days from her first request to telework, and 16 days from her receipt of the checklist). [Doc. 70 at 18-19.]

Unfortunately for Plaintiff, the same analysis regarding Scotch's knowledge of Render's disability applies to his knowledge of her protected activity. As it relates to Render's telework request while she was on FMLA leave, the Court has already determined that it did not amount to a request for a reasonable accommodation sufficient to trigger Defendant's accommodation obligations, and therefore, will not amount to protected activity on which Plaintiff can premise a retaliation claim. *See Jackson v. Laurens Cnty. Sch. Dist.*, 707 F. Supp. 3d 1401, 1414 (S.D. Ga. 2023) (Plaintiff's "request to be assigned duties other than driving a bus was not a reasonable accommodation; thus, he did not engage in a statutorily protected activity.").[47] There is also no evidence to suggest

---

[47] The Court is cognizant that, in this Circuit, an employee engages in statutorily protected activity in requesting an ADA accommodation if she "had a good faith, objectively reasonable belief that [she] was entitled to those accommodations under the ADA." *Standard*, 161 F.3d at 1328. Here, however, Render could not have had an objectively reasonable belief that she was entitled to an accommodation when she requested remote work while on FMLA, as she merely stated that it would be "easier" for her, which neither "identif[ied] her

that Scotch knew about Render's second remote work request (about which a genuine issue of fact remains as to whether it was protected activity), or her request for reduced monitors. And finally, having reviewed it in detail, nothing about the checklist email, on which Scotch was merely copied, identifies it as an accommodation under the ADA, much less put Scotch on notice that Render had engaged in protected activity by identifying her disability and seeking assistance with the limitations caused by it. To wit, the subject line merely reads "Daily Check List," and the body states, in full:

> Decreshia,
> As you requested, below are the things you need to do daily for CA. You can make your own checklist out of this list and print it to keep at your desk to remind you daily what needs to be done.
>
> - Update ticket numbers on CA Smartsheet
> - Update start/expiration date on CA Smartsheet
> - Upload tracker on CA Smartsheet
> - Update structures completed on locates Smartsheet
> - Email your tracker and map to Michael Lohman, Patrick Edwards, Brian Scotch and Locaterequests- using the below format
>   - Project name
>   - total number of structures
>   - number of structures completed for the day
>   - number of total structures completed for that work packet
> - Remember to hit SAVE!

---

disability" nor "suggest[ed] how the accommodation will overcome her physical or mental limitations," as required to amount to reasonable request under the ADA, *Owens*, 52 F.4th at 1335.

Thanks,
Rebecca Swaney

[Doc. 22-20.] Nothing about this email mentioned any disability or limitations Render was suffering from, or otherwise invoked the ADA or its protections; and there is no evidence that Scotch was given additional information to tie this email to Render's stroke, her memory or vision problems, or her requests for accommodations of her limitations. Accordingly, the undersigned cannot conclude that this email amounts to sufficient evidence for a reasonable factfinder to conclude that Scotch had knowledge of any of Render's protected activity.

And for the reasons already explained in the preceding section, the *Martin* decision forecloses any argument that the other circumstantial evidence in this case—Swaney's knowledge of Render's protected activity, Swaney's communications with Scotch about Locators' performance, and the close temporal proximity—can overcome the clear denial of knowledge on Scotch's part. *See* 959 F.3d at 1054-55; *see also Stone v. Geico Gen. Ins. Co.*, 279 F. App'x 821, 824 (11th Cir. 2008) (citation omitted) (noting Eleventh Circuit "rule that the protected activity must be known to the decision-maker who takes the adverse action"); *Brungart*, 231 F.3d at 799-800 (explaining that temporal proximity is

insufficient to establish causation when there is unrebutted evidence that the decision maker did not know about the incident).

In the end, because Plaintiff's evidence once again merely allows that Scotch could have had knowledge that Render engaged in protected activity, the *Martin* decision still controls, and Plaintiff's evidence cannot establish a genuine dispute of fact that Scotch had knowledge of Render's protected activity for purposes of summary judgment. The Court therefore concludes that Plaintiff also cannot establish a prima facie case of retaliation under the *McDonnell Douglas* framework.

### E. Convincing Mosaic

Because Plaintiff has failed to establish a prima facie case of disparate treatment discrimination or retaliation, she is not entitled to the presumption of discrimination under *McDonnell Douglas*, and her claims cannot proceed under that framework. Even so, this does not end the analysis. The Court must still address whether there is sufficient evidence for a reasonable jury to find in Plaintiff's favor under the convincing mosaic approach. *See Ismael v. Roundtree*, 161 F.4th 752, 761 (11th Cir. 2025) ("[A] plaintiff who cannot establish the *McDonnell Douglas* prima facie case is entitled to a full review under the convincing mosaic standard."); *see also Akridge*, 93 F.4th at 1197 (citing *Lewis v.*

*City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) and *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946-47 (11th Cir. 2023)). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185. The convincing mosaic approach "is not more forgiving than the [*McDonnell Douglas* framework] on the final question, which is whether a reasonable jury could infer illegal discrimination." *McCreight*, 117 F.4th at 1335.

On this point, Plaintiff argues that Defendant's stated reasons are pretextual, as (1) it is not clear that Render was the lowest performing Locator, (2) other Locators were hired within months despite Scotch's assertion that they were outsourcing the position, (3) Scotch implemented no progressive discipline with respect to Render's performance after she received a "meets expectations" evaluation in February 2019, and (4) she returned from health-related leave and made requests for accommodations within the two month period before her discharge. [Doc. 70 at 20-22.]

Despite these additional facts, the undersigned cannot agree that Plaintiff has raised a genuine dispute about whether the reason for Render's termination was discrimination or retaliation. Most significantly, there is still no evidence that Scotch—the undisputed decisionmaker for Render's termination—had any knowledge of Render's disability or her protected activity, which ultimately "dooms [her] case." *Sanichara v. GEICO Gen. Ins. Co.*, No. 8:24-CV-2635-VMC-AAS, 2026 WL 113612, at *10 (M.D. Fla. Jan. 15, 2026) (addressing convincing mosaic analysis in case in which decisionmaker lacked knowledge).

Further, as to Render's performance, while she was not always the lowest performing Locator at any given time, there is no dispute that the Productivity Tracker showed she was regularly on the lower end of performers based upon poles-per-hour completed; that beyond that, she missed a great deal of work in September and October 2019; and that her attendance and her overall poles completed was drastically lower than her peers during that same period leading up to her discharge. And as discussed in the background section, Plaintiff has not put forth evidence undermining Scotch's testimony that he relied on the Productivity Tracker's data in making the decision about who to let go (or that his reliance on the Tracker was somehow indicative of improper bias). Even if the Tracker was not entirely accurate, "an employer may fire an employee for a

good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Akridge*, 93 F.4th at 1195 (citation omitted). "The relevant inquiry is [] whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee," and Plaintiff has not shown Scotch did not rely on the Tracker in good faith. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (citation omitted); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers . . . our inquiry is limited to whether the employer gave an honest explanation of its behavior.'") (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)).

That Defendant in fact hired locators in the months following Render's discharge also does not change the calculus. Scotch has testified that new work fell into Defendant's lap and paused further Locator reductions and the outsourcing of Locator work. (Scotch Decl. ¶ 22.) Plaintiff has offered nothing to contradict this account, and further supporting Scotch's explanation, several Locators were indeed let go in July 2020 after that work was complete, despite all

having met performance standards in their most recent evaluations in February 2020, and HR was emphatic that "department reorganization" be included in their separation notice. (PSMF ¶ 53.) Along these same lines, Plaintiff does not dispute Scotch's testimony that Defendant now maintains only a smaller number of high-producing Locators on staff to handle more complicated work. (Scotch Dep. at 35-36.) Accordingly, the Court cannot say that this evidence undermines Defendant's assertions about reducing its in-house Locator team.

Next, on the progressive discipline front, while there is some evidence that Scotch and Hamlett typically followed a progressive policy towards discipline, with counseling and write-ups preceding adverse actions like discharge, it is also true that Scotch testified to having verbal counseling sessions with Render and that the termination of her employment was tied to the Locator-reduction process. As part of a reduction process, then, the question was not whether Render was actually failing but, rather, whether Scotch believed she was performing less successfully than her peers. And as just explained, the Productivity Tracker and other documents showing her attendance tended to support that she was one of the lower producing Locators and missed a great deal of time upon her return to work in September and October 2019.

Finally, the temporal proximity between Render's disclosure of her disability and request for accommodation to Swaney does not create a genuine dispute as to either discrimination or retaliation under the circumstances of this case, largely for the reasons already explained. "[T]emporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021). While Render was discharged several weeks after requesting leave from Swaney, this closeness in time is insufficient by itself to suggest that the real reason for her termination was discrimination or retaliation, at least when the evidence shows that Scotch lacked knowledge of her disability and protected activity. *See Martin*, 959 F.3d at 1054-55; *see also Akridge*, 93 F.4th at 1198 (plaintiff did not establish convincing mosaic of disability discrimination where there was no genuine factual dispute that the decisionmakers who terminated plaintiff did not have knowledge of plaintiff's medical issues, and thus plaintiff failed to present evidence that the reasons for her firing were pretextual); *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015) (stating in the FMLA retaliation context that "[t]emporal proximity alone does not establish a causal connection when there is unrebutted evidence that the decisionmaker was not aware of the protected activity").

For all these reasons, even under the convincing mosaic approach, the undersigned concludes that the evidence still does not allow for the reasonable inference that Render's discharge was the result of disability discrimination or retaliation, at least not in the face of the clear evidence regarding Scotch's lack of knowledge about her disability or protected activity. As a result, Defendant's request for summary judgment as to Plaintiff's disparate treatment and retaliation claims should be **GRANTED**.

**F. Affirmative Defenses, Laches, Administrative Exhaustion**

In its answer to Plaintiff's complaint, Defendant asserts a variety of affirmative defenses, including that Plaintiff's claim are barred by Render's failure to exhaust her administrative remedies [Doc. 3 at 11 (Third Defense)]; by Render's failure to file a timely charge with the EEOC [*id.* (Fourth Defense)]; and, in whole or in part, by the doctrines of waiver and/or estoppel [*id.* at 14 (Twelfth Defense).] In its motion, Plaintiff contends that it is entitled to summary judgment on each of these defenses. [Doc. 48-1 at 17-22.]

As to administrative exhaustion, Plaintiff argues that Render filed a timely charge and that the EEOC engaged in the required process—investigating the charge, communicating with Defendant about the conduct, and engaging in conciliation efforts to remedy the situation. [Doc. 48-1 at 18-20.] Defendant does

not response directly in opposition to this argument or identify any conditions precedent to Plaintiff filing suit that were not met [*see generally* Doc. 64], but briefly points out that either deliberately, by mistake, or as a result of memory loss, Render failed to share material information—such as her car accident, chiropractor appointments, and personal injury settlement—during the EEOC's investigation and conciliation efforts, and argues that the case should be dismissed for failure to exhaust as a consequence. [Doc. 64 at 24-25.] The only citation Defendant provides for this result, however, *Brown v. Snow*, 440 F.3d 1259, 1263 (11th Cir. 2006), makes clear that dismissal is only warranted "when the employee did not provide information *requested by* the investigating agency." *Id.* (emphasis added). Indeed, in *Brown*, the Circuit Court made clear that it had reversed dismissals at the trial court level "when it was unclear from the record whether an employee had provided the agency with the information needed to investigate the complaint." *Id.* The same holds true here. Defendant does not explain what information the EEOC actually requested that Render failed to provide (and Plaintiff identifies none), whether or why Render failed to provide the requested information, or anything else to allow the undersigned to determine whether Render's failure to disclose or remember certain pieces of information "evidenced a refusal to cooperate in good faith with the EEOC" or

was simply a mistake or a function of her memory loss. *Id.* at 1264. And because Plaintiff has proffered evidence that Render and the EEOC exhausted all the administrative requirements to filing suit, and Defendant has not shown that Plaintiff withheld requested information from the EEOC in bad faith, summary judgment should be **GRANTED** to Plaintiff on Defendant's Third Defense.

As to timeliness, Defendant asserts that Plaintiff's complaint is generally "untimely" and that Plaintiff—the EEOC—failed to "pursue its claims in a timely manner." [Doc. 64 at 18.] However, in its response to Plaintiff's arguments for summary judgment, Defendant points to no applicable limitations period that Render or Plaintiff failed to abide by. [*Id.* at 18-19.] As a result, Summary judgment should also be **GRANTED** to Plaintiff on Defendant's Fourth Defense.

As to waiver and estoppel, Defendant argues that, based upon the nearly five-year gap between Render's discharge and Plaintiff's present lawsuit, Plaintiff either waived those claims or is equitably estopped from pursuing them under the doctrine of laches, even though it has never asserted such a defense. [Doc. 64 at 18-22.] In Defendant's view, its stated affirmative defenses of timeliness, waiver, and estoppel all pertain to an actual defense of laches; and it now seeks to have the Court to construe them as such. [*Id.* at 20 ("Whether this Court interprets laches as a waiver of the EEOC's claims (*see* Osmose's twelfth

affirmative defense) or an equitable 'limitations period' (*see* Osmose's fourth affirmative defense), the undisputed evidence is clear that the EEOC is not entitled to summary judgment on this issue.").] In its motion, filed months after Plaintiff's own, Defendant also seeks summary judgment in its favor on the issue of laches. [*See* Doc. 62-9 at 24-25.]

Under Federal Rule of Civil Procedure 8(c), defendants are required to "affirmatively state any avoidance or affirmative defense" in their pleadings. The failure to plead an affirmative defense generally results in a waiver of that defense. *Keybank Nat'l Ass'n v. Hamrick*, 576 F. App'x 884, 888 (11th Cir. 2014); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010); *see also Gen. S. Indus., Inc. v. Shub*, 300 F. App'x 723, 728 (11th Cir. 2008) ("An affirmative defense not pleaded in the defendant's answer is waived.") (citing *Troxler v. Owens–Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983)). And just as a plaintiff may not amend a pleading through a response brief, a defendant may not avoid waiver of an affirmative defense by belatedly raising it in response to a summary judgment motion. *See Gottlieb & Gottlieb, P.A. v. Crants*, 657 F. App'x 920, 923 (11th Cir. 2016); *see also Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1551 (11th Cir. 1991); *cf. Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.")

Defendant has done exactly that here. Among the "avoidance and affirmative defense[s]" that Rule 8 specifically enumerates and requires parties to "affirmatively state" are: estoppel, laches, statute of limitations, and waiver. Fed. R. Civ. P. 8(c). They are clearly delineated as separate defenses, and Defendant offers no authority for the Court to construe the assertion of one delineated defense as a separate one, and so the undersigned declines to do so. And while Defendant managed to assert defenses relating to timeliness, estoppel, and waiver, it never mentioned laches anywhere in its responsive pleading and never sought leave to amend to add it. [*See* Doc. 3.] As a result, Defendant has waived any laches defense it may have had, addressing it for the first time in response to Plaintiff's motion for summary judgment. *See Gottlieb*, 657 F. App'x at 923. And because it has waived the defense, Defendant's subsequent request for summary judgment on the issue is also due to be **DENIED**.

Additionally, because Defendant also has not responded in substance to Plaintiff's summary judgment arguments on the issues of waiver and estoppel (instead arguing that a separate defense is applicable), summary judgment should be **GRANTED** to Plaintiff on those defenses as well. *See Resol. Tr. Corp.*

*v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *see also Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004).

## IV. CONCLUSION

For each of the foregoing reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED IN PART AND DENIED IN PART** [Doc. 48] and that Defendant's motion also be **GRANTED IN PART AND DENIED IN PART** [Doc. 61].

More specifically, it is **RECOMMENDED** that Plaintiff's failure to accommodate claim be **ALLOWED TO PROCEED**, but that summary judgment be **GRANTED** in Defendant's favor on Plaintiff's disparate treatment discrimination and retaliation claims, and in Plaintiff's favor on Defendant's Third, Fourth, and Twelfth Affirmative Defenses, as well as any laches defense Defendant belatedly seeks to assert.

As this is a final report and recommendation, there is nothing further in this action pending before the undersigned. Thus, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**SO RECOMMENDED** this 14th day of July, 2026.

JOHN K. LARKINS III
United States Magistrate Judge